IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION FILE NO. |
| v. | 1:18-CR-277-AT-JKL |
| CEDRICK HILL | |

## FINAL REPORT AND RECOMMENDATION

In the early morning hours of January 5, 2018, FBI Special Agent Paul Szabo located Defendant Cedrick Hill at a metro Atlanta hotel and attempted to arrest him on an outstanding federal arrest warrant. Allegedly, Mr. Hill tried to escape, and, as will be discussed in greater detail below, both SA Szabo and Mr. Hill were badly injured in the ensuing fracas. For his part, Mr. Hill was shot multiple times, and after his arrest, he was transported to Kennestone Hospital, where he remained unconscious in the intensive care unit ("ICU") until January 24, 2018. Twice over the two days after he regained consciousness—on January 25 and 26, 2018—two FBI agents interviewed him, and Mr. Hill made numerous inculpatory statements about the events on January 5. A federal grand jury later indicted Mr. Hill on a

single count of assaulting a federal law enforcement officer in violation of 18 U.S.C. § 111.  [Doc. 1.]

The case is presently before the Court on Mr. Hill's motion to suppress statements he made to the FBI agents during those January 25 and 26 interviews. [Doc. 13.]  There is no dispute that Mr. Hill was in custody at the time of the interviews, nor is there any dispute that the agents advised Mr. Hill of his *Miranda* rights at the outset of both interviews or that both times he signed *Miranda* advice-of-rights waiver forms.  The issues before the Court are whether Mr. Hill's waiver of his *Miranda* rights was valid and whether his subsequent statements were voluntary.  Mr. Hill primarily argues that due to his medical condition, his waiver was not voluntary, knowing, or intelligent and that his subsequent statements were likewise not voluntary.  The government maintains that the interviewing agents did not use any coercive tactics on him and that, despite his medical circumstances, Mr. Hill had his wits about him sufficient to knowingly and intelligently waive his rights.

On June 21, 2019, I held an evidentiary hearing on the motion, at which FBI Special Agent Timothy Burke, FBI Special Agent Jason Cleary, and Vivian Liao, Pharm.D., a pharmacological expert, testified.  [Doc. 32 (hearing transcript,

hereinafter "Hr'g Tr.").[1]]  Because the government bears the burden to prove by a preponderance of the evidence that Mr. Hill voluntarily, knowingly, and intelligently waived his *Miranda* rights and that his statements were otherwise voluntary, the government submitted the initial post-hearing brief.  [Doc. 37.]  Mr. Hill has filed a response [Doc. 42[2]], and the government has filed a reply [Doc. 45].  For the following reasons, I find that the government has met its burden to show that Mr. Hill's waiver of his *Miranda* rights was voluntary, knowing, and intelligent and that his post-*Miranda* statements were voluntary.  I therefore **RECOMMEND** that the motion be **DENIED**.

## I.   BACKGROUND

At around 3:00 a.m. on January 5, 2018, SA Szabo encountered Mr. Hill in the lobby of a Wyndham Hotel in Sandy Springs, Georgia, and attempted to arrest him on an outstanding federal arrest warrant.[3]  (Hr'g Tr. at 5.)  The two engaged in

---

[1] The government's exhibits admitted at the evidentiary hearing are available at docket entry 25 and Defendant's exhibits are available at docket entries 26 and 30.

[2] Mr. Hill initially filed a response at docket entry 41, but shortly thereafter, filed corrected version of the brief, which is located at docket entry 42.  When referring to Mr. Hill's brief, I cite to the corrected brief.

[3] The arrest warrant had been issued on a multi-defendant federal indictment in *United States v. Gordon Evans, et al.*, Case No. 1:16-cr-427-AT-JKL (N.D. Ga.).  Mr. Hill is charged in that case with one count of conspiracy to possess with intent

3

a brief scuffle in the hotel lobby, after which Mr. Hill ran outside to the hotel parking lot, where he jumped into a white Chevrolet Silverado truck. (*Id.*) SA Szabo chased after Mr. Hill, and as Mr. Hill began to drive away, SA Szabo grabbed onto the driver's side door of the truck. (*Id.*) With SA Szabo hanging on the side of the truck and apparently stuck, Mr. Hill allegedly hit another vehicle with the driver's side of the truck, crushing SA Szabo. (*Id.*) Despite sustaining severe injuries, SA Szabo managed to shoot Mr. Hill multiple times. (*Id.*) Mr. Hill then drove out of the hotel parking lot with SA Szabo still dangling from the side of the truck, and drove approximately a quarter of a mile before coming to a stop. (*Id.* at 5-6.) Mr. Hill exited the truck, and both he and SA Szabo ended up on the ground. (*Id.* at 6.) SA Szabo called 911 for help, and as he remained on the ground, Mr. Hill got back into the truck and drove back to the hotel, leaving SA Szabo on the side of the road. (*Id.*) When Mr. Hill returned to the hotel, he entered the lobby and collapsed. (*Id.*)

---

to distribute a controlled substance, in violation of 21 U.S.C. § 846, and one substantive count of possession of methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841. [*See Evans*, No. 1:16-cr-427-AT-JKL, Dkt. No. 33 (superseding indictment).]

Due to the severity of Mr. Hill's wounds (including severe abdominal wounds and, as it would turn out, a lacerated kidney), he was transported to Kennestone Hospital where he remained unconscious until January 24, 2018—a period of nearly three weeks.  (Hr'g Tr. at 6-7; *see also* Def. Ex. 3 [Doc. 26-1] at 2 (providing summary of medical history).)  During that period, he was intubated (meaning that he was on mechanical ventilation to help him breathe) and fed via a feeding tube.  (Hr'g Tr. at 7-8; Def. Ex. 3 [Doc. 26-1] at 2 (summary of expert witness findings detailing medical records).)  He was also administered numerous drugs, including sedatives (midazolam, propofol, and dexmedetomidine), opioid painkillers (fentanyl and oxycodone), anti-psychotic medications (haloperidol and quetiapine), and an anti-fungal medication (fluconazole).  (Hr'g Tr. at 109-12, 115-17, 119; *see also* Def. Ex. 4 [Doc. 26-2] (summary of medications and dosages from January 22 through January 26, 2018).)  During his hospitalization, he remained under arrest, and was under constant supervision by contract guards[4]; his family members and friends could not visit him or communicate with him.  (Hr'g Tr. at 9, 49-50.)

---

[4] The contract guards were stationed in a common area outside the room, within viewing distance.  (Hr'g Tr. at 9.)

5

On January 24, 2018, SA Burke learned from an FBI agent who was serving as a liaison with hospital staff that Mr. Hill had regained consciousness earlier that morning.  (Hr'g Tr. at 7-8.)  The agent advised that Mr. Hill's breathing tube would be removed later that day, and that Mr. Hill "appeared aware and coherent."  (*Id.*)  SA Burke decided to attempt an interview of Burke the following day.  (*Id.* at 8.)

On the morning of January 25, 2018, SA Burke and SA Paul Costa arrived at Kennestone Hospital to attempt the interview.  (Hr'g Tr. at 8-9.)  Before entering Mr. Hill's room, the agents introduced themselves to the medical staff outside the room and stated that they were there to conduct an interview.  (*Id.* at 9.)  The medical staff did not express any concerns with the agents' entering the room at that time or conducting an interview, and prior to entering Mr. Hill's room, SA Burke understood Mr. Hill to be "aware and coherent."  (*Id.* at 9-10, 56.)

SA Burke and SA Costa entered the room at 11:15 a.m., set up recording equipment, and began the interview.  (Hr'g Tr. at 12; Gov't Ex. 1-A at 2.[5])  SA

---

[5] The audio recording of the January 25, 2018 interview was admitted into evidence as Government Exhibit 1 at the evidentiary hearing.  (*See* Hr'g Tr. at 10-11.)  Also admitted was an informal transcription of the interview, as Exhibit 1-A, which has been docketed at entry number 25-2.  (*Id.*)  Because the transcription is not certified, I have relied on the recording of the interview in considering the motion; however, for ease of reference, I refer to the transcript when citing portions

Burke audio recorded the entirety of the agents' encounter with Mr. Hill, which lasted a little over 30 minutes.  (Hr'g Tr. at 10, 12.  *See generally* Gov't Ex. 1.)  Mr. Hill was awake, lying in a hospital bed to which he was restrained at one wrist.  (Hr'g Tr. at 10, 12, 53.)  SA Burke introduced himself and SA Costa.  (Gov't Ex. 1-A at 2.)  He asked Mr. Hill if he (Mr. Hill) had woken up the day before, but Mr. Hill did not answer or even verbally acknowledge the question.  (*Id.*)  SA Burke then asked Mr. Hill if he was "[f]eeling alright," and Mr. Hill made several inaudible responses and also made references to "Fiona."  (*Id.*)[6]

SA Burke explained that he wanted to talk with Mr. Hill about the morning of his arrest.  (Gov't Ex. 1-A at 3.)  SA Burke asked Mr. Hill if he remembered the arrest "pretty good," and Mr. Hill responded "kind of" and "I woke up."  (*Id.*)  SA Burke told Mr. Hill that he did not know anything about the facts underlying the arrest warrant, and wanted instead to focus on the arrest itself.  (*Id.*)  He also twice told Mr. Hill that he had not been charged with anything relating to the arrest.  (*Id.*

---

of the interview.  References to the transcript of that interview are denoted at "Gov't Ex. 1-A at ___.")

[6] SA Burke believed that Mr. Hill misheard him when SA Burked asked if Mr. Hill was feeling all right.  (Hr'g Tr. at 62 ("My belief is that when I said 'feeling all right" maybe I spoke too fast or mumbled, and that he interpreted that as Fiona.").)

at 4.) He additionally stated that he had "video cameras" and had spoken to witnesses, but that he thought "it's only fair" to get Mr. Hill's side of the story before Mr. Hill was charged. (*Id.* at 4-5.)

To gauge Mr. Hill's awareness at the time, SA Burke asked Mr. Hill how much education he had completed, where he went to high school, and to spell the name of his high school. (Hr'g Tr. at 13; Gov't Ex. 1-A at 5-6.) Mr. Hill responded appropriately, indicating that he had completed the twelfth grade and attended Wheeler High School in Marietta, while correctly spelling the school's name. (Gov't Ex. 1-A at 5-6.) SA Burke also confirmed with Mr. Hill that he was originally from Marietta and could read and write English. (*Id.*)

SA Burke then told Mr. Hill that "before [they] could talk and . . . get your side of the story," he had to read and advise Mr. Hill about "two forms." (Gov't Ex. 1-A at 6.) First, SA Burke gave Mr. Hill a copy of the FBI standard advice-of-rights form (FBI form FD-395) and read it aloud to Mr. Hill. (*Id.* at 6-8.) As SA Burke read the form, Mr. Hill repeatedly said, "I got you," "Mm-hm," and "Right," suggesting that he understood what SA Burke was saying to him. (*Id.* at 7-8.) Mr. Hill then signed the form—which affirmed that he had read the statement of his rights, understood his rights, and was willing to answer questions without a lawyer

8

present at that time.  (*Id.* at 8; Gov't Ex. 4 [Doc. 25-4 at 1] (signed *Miranda* waiver).)  SA Burke also gave Mr. Hill a form entitled "Waiver of the Right to Prompt Presentation to a Magistrate" and again read the substantive portion of the form to him.  (Gov't Ex. 1-A at 8-11; Gov't Ex. 5 [Doc. 25-4 at 2] (signed presentment waiver).)  Mr. Hill again indicated his apparent understanding, saying "Right" and "Mm-hm" repeatedly.  (Gov't Ex. 1-A at 9-10.)  Before signing the presentment waiver, Mr. Hill asked where he would appear in court, and SA Burke responded in federal court.  (*Id.* at 11.)  Mr. Hill then signed the waiver.  (*Id.*; Gov't Ex. 5.)

Having obtained the signed waivers, SA Burke then stated, again, that he wanted to get Mr. Hill's "side of the story from that Friday morning, January 5th," and give Mr. Hill "an opportunity to tell . . . [his] side." (Gov't Ex. 1-A at 12.)  Mr. Hill initially responded:  "I don't remember what happened that Friday."  (*Id.*)  He then stated that he learned from the doctors that he had been shot three times, and that he could only remember he had been at a Sheraton on Thornton Road (which would be a different hotel than where he actually encountered SA Szabo).  (*Id.* at 12-13.)

9

Nonetheless, as the interview proceeded, Mr. Hill continued to relate more details. He stated that he was at the hotel with his girlfriend, Keyasha Taylor.[7] (Gov't Ex. 1-A at 13.) He told the agents that as he was trying to leave, a plainclothes police officer attempted to arrest him, so he tried to flee. (*Id.* at 13-14.) He stated that he remembered first encountering the law enforcement officer—whom he described as an "older, white dude," in the hotel lobby, and that the officer identified himself as an FBI agent as Mr. Hill was getting into his car. (*Id.* at 14-15.) Mr. Hill told the agents that he tried to drive away, but that the agent was hanging onto the side of the car. (*Id.* at 15.) Mr. Hill tried to stop, but before he could do so, the agent shot him, all while still in the parking lot. (*Id.* at 15.) Mr. Hill stated initially that the agent was hanging onto the bed of the truck, but later stated that he was hanging on the door. (*Id.* at 18-19.) Mr. Hill also initially stated that his girlfriend was in the car at the time he was shot, but then backtracked, explaining that he could not remember. (*Id.* at 20-21.) As Mr. Hill began to relate the information, SA Burke repeatedly inquired whether Mr. Hill recalled the details

---

[7] Ms. Taylor's first name is transcribed as Keyasha in the hearing transcript, and phonetically as "Keasha" and "Keosha" in the interview transcript. (*Compare* Hr'g Tr. at 36, *with* Gov't Ex. 1-A at 13, 24.) The Court will refer to her as Ms. Taylor or Mr. Hill's girlfriend.

from his memory, and Mr. Hill confirmed, saying "Yeah." (*Id.* at 13-14.)  And when Mr. Hill backtracked, SA Burke stated, "I just wanted it how you remember." (*Id.* at 21.)

Recounting the sequence of events again, Mr. Hill then stated that they were near Cumberland Mall. (Gov't Ex. 1-A at 22-23.)  SA Burke questioned Mr. Hill about whether he may have been mistaken when he earlier identified the hotel as the Sheraton off of Thornton Road, and Mr. Hill responded that "things come back to you," that he had not had much time to think about it, that he had been in the hospital without a "real meal" for three weeks. (*Id.* at 23-24.)  Mr. Hill then asked how "the officer" (referring to SA Szabo) was doing. (*Id.* at 24.)  SA Burke told him that SA Szabo was in the hospital. (*Id.*)  Mr. Hill responded, "For real?" and stated that the agent had not been shot. (*Id.*)

SA Burke redirected the conversation, confirming that Mr. Hill believed that his arrest occurred at a hotel near Cumberland Mall at around three or four in the morning, as he and Ms. Taylor were leaving the hotel. (Gov't Ex. 1-A at 24.)  SA Burke also confirmed that Mr. Hill recalled encountering an older white male in street clothes in the hotel lobby, that the man identified himself as an FBI agent and addressed Mr. Hill by his first name, and that the man put his arms around Mr. Hill,

11

scaring him.  (*Id.* at 24-25.)  SA Burke reiterated that he was asking for Mr. Hill's recollection, saying he "d[id]n't want to put words in [Mr. Hill's] mouth," and asking Mr. Hill to stop him if he got anything wrong.  (*Id.* at 24.)

Mr. Hill next stated that at the time, he did not believe that the man he encountered in the lobby was an FBI agent because the man was alone, and he did not think FBI agents traveled alone when apprehending suspects, "[e]specially at three in the morning."  (Gov't Ex. 1-A at 26-27.)  SA Burke confirmed with Mr. Hill that he ran to his truck parked in front of the hotel.  (*Id.* at 27.)  He asked Mr. Hill if he believed the truck was a Chevrolet Silverado, and Mr. Hill responded affirmatively, adding that it was a rental.  (*Id.*)  Mr. Hill then affirmed that the man he encountered in the lobby chased him into the parking lot, that Ms. Thomas was confused (because neither of them knew he was wanted), and that they were running.  (*Id.* at 28.)  Mr. Hill affirmed that when he got into his truck, the same man, who had identified himself as FBI, was holding onto the driver's side door. (*Id.* at 29.)  Mr. Hill stated that he tried to drive off, while the man shouted, "Stop, Cedrick!  Stop."  (*Id.*)  Mr. Hill did not stop, however, spending "probably like three minutes" trying to pull out of the hotel.  (*Id.*)

Mr. Hill then described his shooting.  (Gov't Ex. 1-A at 29-35.)  He recalled that he made a left to exit the hotel parking lot.  (*Id.* at 30.)  He recalled that there was a red light at which he had to make another left.  (*Id.*)  Mr. Hill stated that it was at the red light that the agent shot him.  (*Id.*)  Mr. Hill stopped, and according to Mr. Hill, he and the agent were "laying at the red light"—and Mr. Hill asked the agent to call 911 because "we're shot."  (*Id.*)  Mr. Hill additionally said that he lay next to the agent on the ground, and that the agent then called 911 and said, "My suspect is shot.  I'm hurt very, very bad."  (*Id.* at 31-32.)  Mr. Hill also recalled that the agent said, "I think I broke my leg."  (*Id.* at 32.)  Mr. Hill then asked if the agent had broken his leg or arm, and SA Burke confirmed that SA Szabo broke his femur, as well as his arm.  (*Id.*)

Mr. Hill next stated that he then jumped back in the truck and drove back to the hotel, as he could hear his girlfriend yelling from the hotel.  (Gov't Ex. 1-A at 32.)  When he got back to the hotel, he told her to call 911 because he had been shot.  (*Id.*)  According to Mr. Hill, the agent remained "laying in the highway" where Mr. Hill had heard him on the phone, and was "still shooting" at Mr. Hill.  (*Id.* at 34.)  Mr. Hill said he came to the hotel where Ms. Thomas was waiting, and could not recall anything further, saying he had blacked out.  (*Id.* at 35.)

After confirming that Hill could not remember anything after entering the lobby, such as an ambulance arriving, SA Burke asked Mr. Hill why he was up so early in the morning. (Gov't Ex. 1-A at 35-37.)  Mr. Hill responded that he had not yet gone to sleep that night and that he and his girlfriend were leaving the hotel to get food, likely from a McDonald's across the street. (*Id.* at 38.)  SA Burke again asked Mr. Hill if he thought that the hotel was a Sheraton, and Mr. Hill responded "Yeah, I know it was a Sheraton." (*Id.* at 38.)

After approximately thirty minutes into the interview, a hospital staff member interrupted the discussion to take Mr. Hill to surgery. (Hr'g Tr. at 17-18, Gov't Ex. 1-A at 39.)  Although SA Burke apologized, said he was unaware of the surgery, and said Mr. Hill needed to go, Mr. Hill asked if he could have ten more minutes to conclude the interview.  (*Id.* at 39-40.)  The staff member, however, insisted that Mr. Hill was due for surgery, and that staff and facilities were waiting. (*Id.* at 40.)  SA Burke told Mr. Hill that they would come back and resume the interview when Mr. Hill was "feeling okay," to which Mr. Hill responded, "I'm waiting on you." (*Id.*)  Then, before Mr. Hill left the room, he shook SA Burke's hand and asked him to shake SA Szabo's hand for him. (*Id.*)  Mr. Hill expressed remorse for hurting SA Szabo, explaining that it was three in the morning, that he

14

did not have a gun on him, and that he was not trying to hurt SA Szabo. (*Id.* at 40-41.) The interview then concluded for the day.

The following morning, January 26, 2018, SA Burke and SA Costa returned to Kennestone Hospital and re-initiated the interview with Mr. Hill, who was in a different area of the hospital and out of the ICU. (Hr'g Tr. at 19, 70; Gov't Ex. 2-A at 2.[8]) Mr. Hill told the agents that he remembered that they had met the day before and that he "signed the paperwork," presumably referring to the advice-of-rights and presentment waivers. (Hr'g Tr. at 20; Gov't Ex. 2-A at 3.) SA Burke explained to Mr. Hill that "if you want to continue talking, we've gotta do that again," and Mr. Hill responded, "I'm gonna tell you all the same exact thing[s]" from the earlier interview session. (Gov't Ex. 2-A at 3.) Before advising Mr. Hill of his rights, SA Burke once again asked Mr. Hill to spell his first name and identify and spell the high school he attended, all of which Mr. Hill did correctly. (*Id.* at

---

[8] The January 26, 2018 interview was also audio recorded. (*See* Hr'g Tr. at 21.) At the evidentiary hearing, a copy of the recording was admitted into evidence as Government Exhibit 2, and an uncertified transcript was admitted as Government Exhibit 2-A. [*See* Doc. 25-3.] Similar to the transcript of the January 25 interview, I have relied on the recording of the interview in considering the motion; however, for ease of reference, I refer to the uncertified transcript when citing portions of the interview. References to the transcript of the January 26 interview are denoted at "Gov't Ex. 2-A at __."

5.)  SA Burke also confirmed that Mr. Hill could read and write in English.  (*Id.* at 6.)  SA Burke read the *Miranda* advice-of-rights form to Mr. Hill, and, in response, Mr. Hill stated that he wanted to speak with the agents and signed the form, indicating that he was waiving his rights.  (*Id.* at 6-7; Gov't Ex. 6 [Doc. 25-4 at 3] (signed waiver-of-rights form).)  SA Burke also reviewed the presentment waiver form with Mr. Hill, and Mr. Hill indicated that he wished to waive those rights as well.  (Gov't Ex. 2-A at 7-9; Gov't Ex. 7 [Doc. 25-4 at 4] (signed presentment waiver form).)  In the course of completing the waiver paperwork, Mr. Hill again reiterated, "I want to talk to you guys."  (Gov't Ex. 2-A at 7.)  At the conclusion of the paperwork, SA Burke directly asked if Mr. Hill "want[ed] to continue talking to [the agents]," to which Mr. Hill said, "yes."  (*Id.* at 9.)

After obtaining Mr. Hill's signed waivers, SA Burke summarized the substance of the previous day's interview to Mr. Hill, and asked Mr. Hill to tell him if he had anything incorrect.  (Gov't Ex. 2-A at 9-11.)  In terms of new details, SA Burke asked Mr. Hill if he recalled jumping over a desk after SA Szabo first confronted him, and Mr. Hill responded:  "It's been about 23 days."  (*Id.* at 11.)  Mr. Hill did add that the Silverado was blue, not white, contrary to his statements the previous day.  (*Id.*)  SA Burke then told Mr. Hill that he thought Mr. Hill was

16

confused about whether Ms. Thomas was with him when he drove out of the hotel parking lot.  (Gov't Ex. 2-A at 12.)  Mr. Hill initially responded that he did not remember whether she was with him after they "came down together" (presumably to the lobby), but went on to say and that he "ran and got in the truck by myself though."  (*Id.* at 12-13.)  Mr. Hill additionally stated that his truck was backed into the parking spot.  (*Id.* 13.)

The two then briefly discussed the portion of events after Mr. Hill left the hotel with SA Szabo on the car, with SA Burke asking, "Do you remember what happened?"  (Gov't Ex. 2-A at 13.)  Mr. Hill stated that after SA Szabo shot him the first time, he was "fixing to stop," and when SA Szabo shot him a second time, he turned and in fact stopped.  (*Id.* at 14.)  He said he got out of the truck, helped SA Szabo off the side of the truck where he was stuck, and told SA Szabo to call 911.  (*Id.*)  He laid next to SA Szabo "just for a second," while they "were waiting on 911," but got up when he realized he had left Ms. Thomas at the hotel.  (*Id.* at 14-15.)  Mr. Hill also stated that he recalled SA Szabo telling him that he thought his leg was broken.  (*Id*. at 16.)  Mr. Hill said that he returned to the hotel, and Ms. Thomas and the hotel staff called 911.  (*Id.* at 15.)

Mr. Hill continued to answer questions about the shooting and dragging SA Szabo. (Gov't Ex. 2-A at 16-24.) He thought that his entire encounter with SA Szabo only took five or six minutes. (*Id.* at 17.) He said that he was not sure, at the time, whether SA Szabo was in fact with the FBI, and said he would not have run otherwise. (*Id.* at 20-21.) He explained that it was only after SA Szabo repeated that he was with the FBI *after* Mr. Hill stopped the truck that he (Mr. Hill) fully appreciated that SA Szabo was actually FBI, at which time he helped SA Szabo detach his arm from where it was pinned to the truck. (*Id.* at 22-23.) He also told the agents that he returned to the hotel not only to get Ms. Thomas, but also his four-year-old daughter, who was still in the hotel room. (*Id.* at 24-25.)[9] Mr. Hill also later stated that when he got back to the hotel he did not recall seeing Ms. Thomas, which was inconsistent with his previous statements. (*Id.* at 26.)

SA Burke then showed Mr. Hill video footage obtained from the Wyndam Hotel and city traffic cameras depicting the events of Mr. Hill's encounter with SA Szabo, and continued to ask Mr. Hill questions. (Gov't Ex. 2-A at 29-44.) Before beginning, SA Burke explained that they had spoken about Mr. Hill's memory

---

[9] There is, however, no other indication that his daughter was, in fact, present at the hotel at that time.

alone up to that point, and now wanted to see if the video would help with his recollection; he stated further that he also wanted to give Mr. Hill an opportunity to explain anything in the video. (*Id.* at 27.) At the outset of the video review, SA Burke noted that the truck did not appear blue, that the hotel was a Wyndham Hotel, but that there was a McDonalds across the street. (*Id.* at 29.) Upon review of the video and questioning by SA Burke, Mr. Hill admitted, among other things, to swerving the truck in order to get the man off the truck, including by hitting at least one car. (*Id.* at 36-38.)

At approximately the 45-minute mark, SA Burke said they would "rehash, the two of us, [and] just make sure we have your story right." (Gov't Ex. 2-A at 46.) SA Burke told Mr. Hill that Mr. Hill had not yet been charged for the January 5th incident and that he was being held on the arrest warrant in the other case. (*Id.* at 46-47.) Mr. Hill responded with surprise upon hearing that there really was a federal warrant for his arrest, and said we was completely unaware of the warrant. (*Id.*) Mr. Hill went on to confirm that while he might have tried to hurt SA Szabo at the outset of the incident, once he realized that SA Szabo was an FBI agent, he worked to dislodge him from the truck and to ensure he called 911. (*Id.* at 49-51.) Mr. Hill asked SA Burke to tell SA Szabo that he apologized and that had he known

SA Szabo was an FBI agent, he would have "stopped right there in the lobby." (*Id.* at 55.)  Mr. Hill again reiterated multiple times that he did not know that SA Szabo was a member of law enforcement, and that he had been thinking and praying about everything. (*Id.* at 55-59.)  Mr. Hill said he "kn[e]w that he f[---]ed up," and was "not gonna lie to [SA Burke] ever." (*Id.* at 57.)  He again asked the agents to apologize to SA Szabo for him. (*Id.* at 59.)

At the end of the interview, Mr. Hill asked whether the two agents "have the word" on charging him, appearing to ask if they would decide whether he would be charged for the events on January 5. (Gov't Ex. 2-A at 62.)  SA Burke responded that he could not promise what "they're gonna decide as far as charging you." (*Id.*)  Mr. Hill then stated:  "I understand, but you're gonna make your decision if you want to charge me." (*Id.* at 63.)  SA Burke responded:  "What I'm going to tell the prosecutor is that I think you're remorseful, that while you tried to hurt [SA Szabo], it was because you were scared and you didn't know, 'cause that's what I've heard you say." (*Id.*)  SA Burke added:  "But you know investigators aren't final decisionmakers, too.  So the best I can tell you right now is I promise you I'd get your side of the story before and you have my word on that . . . ." (*Id.*)  The interview concluded at 9:48 a.m. (*Id.* at 64.)

20

Shortly after that interview ended, FBI Special Agents Jason Cleary and Brittany James entered Mr. Hill's room to interview him about the drug charges on which Mr. Hill had been arrested.  (Hr'g Tr. at 87-89.)  The agents also recorded their interactions with Mr. Hill that day.  (*Id.* at 90; Gov't Ex. 9.[10])  SA Cleary and SA James began the interview by introducing themselves and showing Mr. Hill a copy of the arrest warrant.  (Gov't Ex. 9 at 0:00-1:00.)  After giving the warrant to Mr. Hill to read, SA Cleary stated that he and SA James would like to talk to him about it.  (*Id.* at 1:01-02.)  SA Cleary asked Mr. Hill for identifying information, including his date of birth, social security number, and home address, all of which Mr. Hill provided.  (*Id.* at 1:29-1:59.)

SA James presented Mr. Hill with copies of the same or at least nearly identical[11] *Miranda* and presentment waiver forms that SA Burke had shown him in the previous interviews, advised Mr. Hill of his *Miranda* rights, and asked him

_____

[10] Government Exhibit 9 is a disc containing the entirety of SA Cleary and SA James's interactions with Mr. Hill on January 26, 2018.  (*See* Hr'g Tr. at 90.) The parties did not provide a transcript of the interview, so when referring to particular portions of the interview, I refer as best as possible to the elapsed time according to the software I used to listen to the recording.

[11] Although the forms presented by SA James were not entered into the record, based upon her reading of the forms in the interview recording, there is no doubt the content of the forms were the same.  (*See* Gov't Ex. 9 at 5:03-6:11)

to read the final line of the form aloud, which he did.  (Gov't Ex. 9 at 2:50-3:51; *see also* Hr'g Tr. at 95-96.)  She asked Mr. Hill if he understood what it meant and if he was willing to waive his *Miranda* rights, and he responded that he did and signed the waiver form.  (Gov't Ex. 9 at 3:52-4:27; Hr'g Tr. at 91.)  During this discussion, SA James mentioned that they were going to "go more into detail" about the arrest warrant and underlying indictment, and would not talk about anything relating to his discussion with SA Burke and SA Costa.  (Gov't Ex. 9 at 2:25-2:43.)

SA James then explained the presentment waiver to Mr. Hill and read it to him.  (Gov't Ex. 9 at 4:30-6:11.)  In explaining the waiver, SA James explained that Mr. Hill had the right to go before a judge and have the charges in the indictment explained to him, and that he had to waive that right to continue with the interview.  (*Id.* at 4:45-5:00.)  She then read the form (*id.* at 5:01-6:11), but Mr. Hill responded that he did not want to sign "this one," (*id.* at 6:12-13; *see also* Hr'g Tr. at 92).  SA James attempted to explain the difference between the *Miranda* waiver and the presentment waiver to Mr. Hill, but Mr. Hill persisted in his refusal to sign the waiver.  (Gov't Ex. 9 at 6:15-7:04.)  SA Cleary stepped out to call the prosecutor and ask for advice on how to proceed.  (*Id.* at 7:12-8:58; Hr'g Tr. at 92.)

22

Meanwhile, SA James remained in Mr. Hill's room with the recorder on, and Mr. Hill indicated that he was concerned that if he signed the waiver, he would be removed from the hospital and "taken to a facility." (Gov't Ex. 9 at 7:44-53; Hr'g Tr. at 96.)[12] SA James twice explained that the purpose of the presentment waiver simply pertained to his right to prompt presentment to a magistrate judge, and that because of his injuries, he would not be removed from the hospital. (Gov't Ex. 9 at 7:56-10:06.) Mr. Hill responded that the "two dudes" who had previously come in (referring to SA Burke and SA Costa) had not presented him with "no form that looked nothing like that." (*Id.* at 10:13-10:21.) SA James explained that she and Cleary were there to talk about something "totally different" and that they were involved in the earlier case that led to Mr. Hill being arrested and were "responsible for that warrant." (*Id.* at 10:21-35.) She reiterated that the previous interview was about the events that occurred on January 5, so those agents only had a *Miranda*

---

[12] In the course of concluding the prior interview, SA Burke mentioned that when Mr. Hill had recuperated more and was ready to be moved, he would likely be transported to the infirmary of a federal detention center. (Hr'g Tr. at 61.) This aside by SA Burke may have concerned Mr. Hill and resulted in his apprehension about signing the waiver.

advice-of-rights form, and not the presentment waiver form. (*Id.* at 10:47-57.)[13]

SA Cleary then confirmed with Mr. Hill that he did not wish to speak to the agents,

and terminated the interview after approximately 12 minutes. (*Id.* at 11:22-11:27;

*see also* Hr'g Tr. at 97.)

Based upon his brief interaction with Mr. Hill, and his ability to answer the

background questions, SA Cleary testified that he found Mr. Hill to be coherent.

(Hr'g Tr. at 92.)

At the evidentiary hearing, Mr. Hill presented the testimony of Dr. T. Vivian

Liao, a state-licensed Doctor of Pharmacy, who was qualified as an expert in the

field of clinical pharmacology and pharmacological effects of narcotics without

objection. (Hr'g Tr. at 98, 100, 103-04.) Dr. Liao testified that based on her review

of Mr. Hill's hospital records from January 5 to January 26, 2018, the audio-

recorded interviews, and pertinent medical literature (pertaining to pharmacology

and the cognitive effects of long-term intensive care treatment), Mr. Hill was

cognitively impaired due to the sedation and drowsiness caused by the various

---

[13] Although SA Burke and SA Costa had provided Mr. Hill with presentment
waivers, which he executed (*see* Gov't Exs. 5, 7 [Doc. 25-4 at 2, 4]), it appears SA
James was unaware of that fact.

24

medications he received during his intensive care stay. (*Id.* at 104-08.)[14]  She testified that during the 72 hours preceding the first interview, Mr. Hill was administered fentanyl "around the clock." (*Id.* at 109.)  He was also taking oxycodone in a pill or tablet form and had additional fentanyl infusions outside of the continuous infusion. (*Id.* at 109-10.)  Dr. Liao testified that some of the side effects of fentanyl and oxycodone, both of which are classified as opioid medications (or analgesics), include pain relief, respiratory depression, and possible drowsiness. (*Id.* at 109-11.)

Dr. Liao testified that from January 22 forward, Mr. Hill was also administered sedatives, including a continuous infusion of midazolam, propofol, and dexmedetomidine in IV form. (Hr'g Tr. at 111.)  The side effects of those medications include, primarily, drowsiness or sleepiness, and can also reduce anxiety and blood pressure. (*Id.* at 112.)  In addition, Dr. Liao testified, the sedatives and opioids that Mr. Hill was taking can interfere with the signaling process in the brain, causing delirium. (*Id.* at 112-14.)  Even so, Dr. Liao explained

---

[14]  Dr. Laio never physically examined or interviewed Mr. Hill. (Hr'g Tr. at 104.)

that the medications can be titrated or adjusted in accordance with a patient's response to their administration.  (*Id.* at 112.)

Dr. Liao testified that the length of time that a patient experiences effects of opioids or sedatives varies depending on the patient's ability to metabolize a given medication, and can also be influenced by other drugs that the patient is taking. (Hr'g Tr. at 115.)  For a person with normal kidney functions, the effects of fentanyl typically last between two and four hours.  (*Id.* at 116.)  But because Mr. Hill had sustained a kidney injury and was taking other medications (including an anti-fungal medication), fentanyl could cause effects lasting for a 25% longer period of time.  (*Id.* at 117-18.)  She explained that Mr. Hill's kidney injury would also affect the ability of his body to expel the oxycodone and midazolam from his body.  (*Id.* at 119.)

Dr. Liao also testified that Mr. Hill had received antipsychotic medications, quetiapine and haloperidol, intravenously to treat agitation, a possible sign of delirium.  (Hr'g Tr. at 119-20.)  Dr. Liao stated that since she is not a medical physician, she was not qualified to determine whether Mr. Hill actually suffered from delirium.  (*Id.* at 120.)  Nonetheless, she stated that she believed that some of Mr. Hill's inaccuracies in recounting the events of January 5, such as that his

26

daughter was present at the incident, suggests that Mr. Hill's cognitive abilities—including his ability to retrieve memories, his processing speed, and his ability to maintain focus—were impaired. (*Id.* at 120-21.)

Dr. Liao testified that based on her experience, she believed that a patient waking up in the ICU after three weeks would likely not be able to provide informed consent for medical procedures. (Hr'g Tr. at 122.)

Finally, Dr. Liao acknowledged that "using the right assessment tools," evaluating whether or not a patient is drowsy or sedated can be verified through "observation and conversation with a patient," and Mr. Hill's medical records indicated that on the Glasgow Coma Scale, an assessment tool that measures the level of alertness of a patient, Mr. Hill scored a 14 out of 15 on January 25, 2018 and 15 out of 15 on January 26, 2018, high levels of alertness. (Hr'g Tr. at 133-34.)

Additional facts are discussed as necessary in the analysis below.

## II.   DISCUSSION

### A.   The Parties' Arguments

As discussed in the introduction, the primary issues raised by Mr. Hill's motion to suppress are, first, whether Mr. Hill's waivers of his *Miranda* rights during his interviews with the FBI agents on January 25 and 26, 2018 were valid;

27

and, second, whether his subsequent statements were voluntary.  On the first issue, the government contends that Mr. Hill's waiver was voluntary, knowing, and intelligent.  [Doc. 37 at 10-15.]  As to voluntariness, the government argues that there is no evidence of coercive police activity that would render Mr. Hill's *Miranda* waiver involuntary.  [*Id.* at 11-12.]  The government points out that the agents' interviews were relaxed and non-confrontational, that the agents did not display any weapons, and that they did not threaten Mr. Hill or make any promises to him.  [*Id.* at 11.]  At the beginning of the first interview, the agents confirmed that Mr. Hill did not need anything from his nurses, could reach his water, and was "good" when the agents' turned off his fan to reduce the noise level.  [*Id.*]  And at the outset of the second interview, the agents asked about Mr. Hill's condition and made small talk.  [*Id.*]

The government likewise argues that the totality of the circumstances establish that Mr. Hill's waiver was knowing and intelligent.  [Doc. 37 at 12-15.]  Acknowledging that Mr. Hill's medications "had the *potential* to undermine his decision-making abilities," the government submits that the totality of the evidence establishes that despite his medication and injuries, Mr. Hill "had his wits about him when he spoke to agents from his hospital bed on January 25th and 26th, and

28

this is essentially what the law requires." [*Id.* at 12.] The government points out that Mr. Hill was awake and alert during both interviews, he did not slur his words or appear drowsy, the hospital staff did not express concerns about the agents' speaking with Mr. Hill, and he was able to identify and spell the name of his high school. [*Id.* at 12-13.] In addition, the government notes that Mr. Hill's medical records show that on the days of the interviews, he was ranked at a level 14 out of 15 and 15 out of 15 on the Glasgow Coma Scale, indicating that he was alert. [*Id.* (citing Hr'g Tr. at 133-34).] The government also contends that Mr. Hill was willing to speak to the agents and was cooperative during the interviews, that his statements were coherent and detailed, and that his memory of the events, though not perfect, were generally accurate. [*Id.*] Also, the government points out, Mr. Hill declined to speak to SA Cleary about the charges pending against him in the other case, indicating that Mr. Hill in fact deliberately chose to speak to the agents about the arrest, perhaps "to mitigate the consequences of his actions." [*Id.* at 14.] Finally, the government observes that Mr. Hill has a high school education and experience with the criminal justice system (including his right not to answer law enforcement's questions), as he was previously arrested in 2017 on a drug offense. [*Id.* at 15.] In sum, the government maintains that despite Mr. Hill's medical

condition, "the weight of the evidence regarding Mr. Hill's cognitive abilities and lack of impairment . . . is consistent with free and rational conduct." [*Id.* (quotation marks omitted).]

In response, Mr. Hill argues that his *Miranda* waiver at the first interview was not voluntary because SA Burke's statements that Mr. Hill was not yet facing charges and that the agents wanted to get his side of the story induced Mr. Hill to believe (wrongly) that if the agents found his account of the events satisfactory, Mr. Hill "could avoid being charged altogether." [Doc. 42 at 15-16.] He contends that SA Burke falsely implied that the decision about whether to charge Mr. Hill was up to the agents, rather than a prosecutor, and only revealed the truth at the conclusion of the interviews. [*Id.* at 16.] Mr. Hill additionally contends that there was no exigency that required the agents to interview Mr. Hill just one day after emerging from a near three-week coma. [*Id.* at 16.] According to Mr. Hill, the agents deliberately took advantage of Mr. Hill while he was "still functioning under the cloud of uncertainty and haze that waking up after three weeks in a comatose state would bring." [*Id.* at 16.]

Mr. Hill also argues that regardless of whether the agents coerced him to waive his *Miranda* rights on January 25 and 26, 2018, his waivers were not

30

knowing or intelligent because he was "receiving anti-psychotic medication and likely still under the influence of powerful pain medication, fentanyl." [Doc. 42 at 18.]  Mr. Hill points out that during both interviews, he had memory lapses and difficulty accurately recalling the events of January 5, and that he gave "conflicting, non-responsive and sometimes flat out wrong response" to questions, indicating that he was impaired at the time.  [*Id.*]  He further notes that he could not even provide informed consent to a surgery that he underwent on January 25, which prompts the question how he could voluntarily waive his *Miranda* rights that day. [*Id.* at 19.]

Finally, Mr. Hill argues that regardless of the voluntariness of his *Miranda* waiver, his subsequent statements were not voluntary.  [Doc. 42 at 19-20.]  Mr. Hill points out that during the nearly three-week period before the interviews, he had been under around-the-clock guard and he was not allowed to communicate with anyone.  [*Id.* at 20.]  He was also restrained in the hospital bed, rendering him "unable to escape or resist the thrust of the interrogation"; had been taking powerful sedatives, painkillers, and anti-psychotic medications in the days leading up to the interviews; and was likely suffering from delirium at the time of the interviews, impairing his cognitive abilities and executive functions.  [*Id.*]

31

On reply, the government argues that even though Mr. Hill's recitation of the events was not completely accurate, the content of the interviews demonstrate that he knowingly and intelligently waived his *Miranda* rights, despite his medical circumstances.  [Doc. 45 at 1-5.]  The government stresses that even though the medications Mr. Hill took had the potential to impact his cognitive functioning, the record does not show that they actually impaired his functioning to such an extent that he could not knowingly, intelligently, and voluntarily waive his *Miranda* rights. [*Id.* at 2.]  The government goes on to identify numerous instances where Mr. Hill recalled facts in fine detail, despite some areas of inconsistency or confusion.  [*Id.* at 3-4.]  The government additionally argues that the agents did not mislead Mr. Hill or make any implied promises inducing him to waive his rights or answer their questions.  [*Id.* at 6-8.]

### B.     Applicable Law

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court created a presumption that statements elicited during a custodial interrogation of a suspect are unconstitutionally coerced unless the suspect is first advised of his right to remain silent and to have an attorney present during any questioning.  *United States*

*v. Patane*, 542 U.S. 630, 639 (2004); *Miranda*, 384 U.S. at 444-45.  As a result, questioning may proceed only if the suspect lawfully waives his rights.  Without a valid waiver, "evidence obtained as a result of a custodial interrogation is inadmissible . . . ."  *United States v. Parr*, 716 F.2d 796, 817 (11th Cir. 1983).

The inquiry as to whether a suspect has validly waived his rights has "[t]wo distinct dimensions":

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quotation and citation omitted).  The government bears the burden to prove by a preponderance of the evidence that the suspect voluntarily, knowingly, and intelligently waived his *Miranda* rights.  *United States v. Bernal-Benitez*, 594 F.3d 1303, 1318 (11th Cir. 2010).

Even if government satisfies its burden of showing a valid *Miranda* waiver, the government still must establish that the ensuing statements themselves were voluntary.  *See United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir. 1994) ("Determining the admissibility of a postarrest confession requires a two-part

inquiry.  We first decide whether the law enforcement officers complied with the requirements of *Miranda v. Arizona*; if so, we then determine if the confession was voluntary.") (citations omitted); *see also United States v. Sims*, 719 F.2d 375, 378 (11th Cir. 1983) ("First, the court considers whether the government has complied with the *Miranda* requirements.  Upon finding compliance with *Miranda*, the court then rules on the confession's voluntariness.") (citations omitted).  "Voluntariness of statements is analyzed similarly to voluntariness of the *Miranda* waiver."  *United States v. Byrd*, No. 1:16-CR-315-TWT-AJB, 2017 WL 3821696, at *5 (N.D. Ga. Aug. 7, 2017), *report and recommendation adopted*, 2017 WL 3783029 (N.D. Ga. Aug. 31, 2017).

**C.    Analysis**

**1.    The Voluntariness of Mr. Hill's *Miranda* Waiver**

The Court first addresses the voluntariness of Mr. Hill's *Miranda* waivers. As noted above, Mr. Hill's main argument is that due to his medical condition, he was unable to voluntarily waive his *Miranda* rights, and, along these lines, he asserts that the agents' tactics were improperly coercive given his vulnerable medical state.

The primary focus of the voluntariness inquiry is whether there has been overreach by law enforcement, though the Court must look to the totality of the

34

circumstances, including "the defendant's characteristics," *Bernal-Benitez*, 594 F.3d at 1319, and whether he possessed the "capability" to make "an independent and informed choice of his own free will," *United States v. Rouco*, 765 F.2d 983, 993 (11th Cir. 1985). Along these lines, the Eleventh Circuit recognizes that a diminished mental capacity does not alone render a waiver or subsequent statements involuntary. *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995) ("The fact that a defendant suffers a mental disability does not, by itself, render a waiver involuntary."); *see also United States v. Charleston*, No. 1:15-CR-00127-TWT-JSA, 2016 WL 7422685, at *6 (N.D. Ga. Nov. 21, 2016) ("[T]hat a Defendant has been administered medication, or otherwise ingested controlled substances, does not render his statements and waivers *per se* involuntary."), *report and recommendation adopted*, 2016 WL 7404651 (N.D. Ga. Dec. 21, 2016); *United States v. Quinones*, No. CR410-223, 2012 WL 2064705, at *3 (S.D. Ga. May 22, 2012) ("It is well settled that neither mental illness nor the consumption of intoxicants necessarily invalidates a Miranda waiver."), *report and recommendation adopted*, 2012 WL 2064847 (S.D. Ga. June 6, 2012); *accord United States v. Minard*, 208 F. App'x 657, 660 (10th Cir. 2006) ("Hospitalization and pain alone are not enough to create any sort of presumption of coercion or

involuntariness"). Rather, for a waiver to be involuntary, there must be psychological or physical coercion by an official actor (such as a law enforcement agent) who takes advantage of the defendant's mental impairment. *Barbour*, 70 F.3d at 585; *see also Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (holding that coercive police activity is a necessary predicate for finding that a confession is not voluntary).

In the present case, considering the totality of the circumstances, the government has met its burden to establish by a preponderance of the evidence that the agents did not exploit Mr. Hill's mental or physical condition to induce him to waive his *Miranda* rights. The agents did not display their weapons, they did not harm or threaten to harm him, and they did not promise him any benefit if he agreed to speak with them. Reviewing the recording of the interview, the agents' tone was nonconfrontational and relaxed; they did not yell, scream, use obscenities, or otherwise intimidate Mr. Hill. SA Burke told Mr. Hill that he wanted to discuss only the events surrounding his arrest, and not the criminal charges underlying the reason for his arrest. The agents repeatedly stressed that they only wanted Mr. Hill to share those details that he could recall from memory; and particularly during the

first interview on January 25, they did not press Mr. Hill on any apparent inconsistencies or inaccuracies in his recollection.

Nor can it be said that the agents took undue advantage of Mr. Hill's condition. SA Burke and SA Costa waited to meet with Mr. Hill until they were informed that he "appeared aware and coherent," and only interviewed Mr. Hill for two relatively short periods of time. (Hr'g Tr. at 7-8.) The medical staff did not express any concerns with the agents entering Mr. Hill's room or conducting the first interview on January 25. (Hr'g Tr. at 9.) At the beginning of that interview, SA Burke asked Mr. Hill if he needed anything from the nurses, and Mr. Hill responded in the negative. (Gov't Ex. 1-A at 5.) Also, the first interview was stopped when the hospital staff came into Mr. Hill's room to take him to surgery, despite Mr. Hill expressing a desire to continue. (*Id.* at 39-40.) At both interviews, before asking substantive questions about the events surrounding his arrest, the agents satisfied themselves that Mr. Hill was sufficiently lucid. (*Id.* at 5-6; Gov't Ex. 2-A at 5.) Although Mr. Hill sounded a little groggy and mumbled during the first moments of the January 25 interview, within minutes (and before he reviewed the waivers with the agents), his answers were largely comprehensible, his speech was not slurred, and he engaged intelligently with the agents. Although Mr. Hill at

37

first said he could not recall the events of January 5, he immediately thereafter began recounting the details of that day without pressure from the agents, and confirmed to SA Burke that "this is all from [his] memory." (Gov't Ex. 1-A at 12-13.) During his talks with SA Burke and SA Costa, Mr. Hill did not complain about pain or express any concern that he was unable to understand the circumstances of the interviews or wished to stop the interviews. He also explicitly stated at numerous points in the interview that he wished to speak to the agents. (*See, e.g.*, Gov't Ex. 1-A at 40; Gov't Ex. 2-A at 6-7, 9.) Apart from signing the *Miranda* waivers, he asked the hospital staff at the conclusion of the first interview if he could continue speaking with the agents (*see* Gov't Ex. 1-A at 40), and the following morning, he stated that he was ready to resume the interview even without being re-advised of his rights (*see* Gov't Ex. 2-A at 6).

In reaching the conclusion that Mr. Hill's waiver was voluntary, I find the Fourth Circuit's decision in *United States v. Cristobal*, 293 F.3d 134 (4th Cir. 2002), instructive. Cristobal was shot during his arrest, transferred to a hospital where he underwent emergency surgery, and was placed into soft restraints following surgery due to concern that he was a danger to himself. *Cristobal*, 293 F.3d at 138. The following morning, while Cristobal was still in the ICU, two ATF

agents spoke with a nurse, who advised that Cristobal was oriented at the time. *Id.*

The agents met with Cristobal and advised him of his *Miranda* rights, which he

waived. *Id.* The interview lasted for approximately an hour, during which time

Cristobal gave a detailed confession. *Id.* He communicated in English, his speech

was not slurred, he did not nod off or sleep, he did not indicate that he was "under

a narcotic stupor," and he did not ask to stop the interview. *Id.* Cristobal later

moved to suppress his statements on the grounds that his waiver was not voluntary

because he was on narcotic pain medication at the time of the interview. The Fourth

Circuit disagreed, holding held that Cristobal's waiver was voluntary. The Court

explained:

> The fact that Cristobal had been given pain killers and narcotics such
> as morphine is not enough to render his waiver involuntary. In
> making a determination on whether one's will has been overborne,
> we certainly must take into consideration "the characteristics of the
> defendant." However, a deficient mental condition (whether the
> result of a pre-existing mental illness or, for example, pain killing
> narcotics administered after emergency treatment) is not, without
> more, enough to render a waiver involuntary. "While mental
> condition is surely relevant to an individual's susceptibility to police
> coercion, mere examination of the confessant's state of mind can
> never conclude the due process inquiry."

*Id.* at 141 (citations omitted; alteration adopted). The court went on to note that

Cristobal did not ask not to be interviewed due to pain, no officer harmed or

threatened to harm him if he did not waive his rights, and the officers did not

pressure him.  *Id.*  To the contrary, the questioning agent ensured that he was alert before attempting the interview, introduced himself to Cristobal, explained the nature of the investigation, read Cristobal his *Miranda* rights, and made sure that Cristobal was "in fact a willing participant" even after the waiver.  *Id.*  Mr. Hill's situation was remarkably analogous to Cristobal's.

Mr. Hill points to several circumstances of the interviews that, in his view, demonstrate coercive police tactics, but the Court finds they do not outweigh the other evidence of record.  Mr. Hill points out that the agents turned his fan off at the beginning of the first interview, implying that they deliberately tried to make Mr. Hill uncomfortable.  There is no indication, however, that turning off the fan caused Mr. Hill any discomfort whatsoever; indeed, Mr. Hill told SA Costa that he was "good" with the fan being turned off when SA Costa offered to switch it back on.  (Gov't Ex. 1-A at 5.)[15]  Mr. Hill also points out that he was restrained to his hospital bed during the interviews.  Being handcuffed, however, falls far short of the sort of physical duress that sufficient to overbear a suspect's will.  *See Shriner v. Wainwright*, 715 F.2d 1452, 1456 (11th Cir. 1983) ("The use of handcuffs does

---

[15] Moreover, SA Costa explicitly stated that he was turning off the fan to "hear [Mr. Hill] a little better."  (Gov't Ex. 1-A at 5.)  In reviewing the audio-recording, it is decidedly easier to hear the interview after the fan was shut off.

not establish coercion . . . ."); *United States v. Ogden*, 572 F.2d 501, 502 (5th Cir. 1978) ("The fact that defendant was wearing handcuffs does not indicate or even suggest that he was coerced."). Plus, there is no indication that Mr. Hill was in any material amount of discomfort due to the restraint.

Mr. Hill also points out that he could not leave the hospital or communicate with others during the three-week period that he was hospitalized. But during that period, he was unconscious, so it is dubious that his inability to communicate with family members or friends or leave the hospital had any material effect on the voluntariness of his interactions with the agents. Mr. Hill additionally makes much of the fact that the agents repeatedly told him that the interview was his opportunity to tell his side of the story; however, those statements were not so coercive so as to overbear his will. Similarly, Mr. Hill's contention that the agents led him to believe that they had final say over the decision to charge him is simply not borne out by the record, as the agents never said or implied that the charging decision rested with them.[16]

---

[16] While it is true that SA Burke did not affirmatively state that the charging decision would be made by other authorities until the conclusion of the interview on January 26 when Mr. Hill questioned him about it, neither he nor SA Costa ever suggested anything to the contrary, and SA Burke was not evasive in responding to Mr. Hill's questions on the topic.

41

Mr. Hill also argues that the FBI's tactics were coercive because they interviewed him while he was still in intensive care and that there was no need to conduct the interview so soon after his regaining consciousness.  The Fourth Circuit in *Cristobal* addressed—and rejected—a similar argument—*i.e.*, "that coercion and police overreaching occurred . . . merely because the agents did not wait until Cristobal was released from the hospital or transferred out of intensive care before subjecting him to questioning."  *Cristobal*, 293 F.3d at 141 n.9.  The court explained:

> We cannot, without serious repercussion, agree with this argument. If police conduct could be deemed coercive simply because an interrogation occurs while a suspect is in the hospital, law enforcement officers would be faced with a serious dilemma—wait until suspects are released (and thus risk losing valuable crime-solving or further crime-preventing information), or risk suppression of statements necessary for conviction.  We certainly recognize that there are many scenarios that could render a hospital confession involuntary.  Because, in many instances, hospital patients are weakened physically and perhaps mentally, law enforcement officials must be cautious not to exploit suspects' conditions with coercive tactics.

*Id.*  The same rationale applies here.  The focus of the voluntariness analysis is on whether law enforcement exploited Mr. Hill's condition with tactics designed to

42

coerce a waiver or confession. [17]   Here, considering the totality of the circumstances, "[t]he mere fact that [SA Burke] did not wait to interview [Mr. Hill] does not amount to police overreaching." *Id.; see also United States v. George*, 987 F.2d 1428, 1430 (9th Cir. 1993) (finding statements made by a drug mule in critical condition in a hospital emergency room, three hours after suffering a heroin overdose, and approximately four hours before stabilizing, were voluntary because he spoke willingly and coherently, said he understood his rights and waived them, was responsive to questioning, and was able to accurately remember at least significant details; additionally, the questioning officer kept the interview short, asked simple questions, and never received any indication the suspect wanted a lawyer before answering more questions).

---

[17] Mr. Hill notes in passing that while he was executing the *Miranda* waiver, "his medical monitoring equipment [began] to beep continuously," for about six minutes, and that the agents did not pause the interrogation at that point to request medical assistance to check on Mr. Hill's status.  [Doc. 42 at 5.]  (*See* Hr'g Tr. at 63-64.)  To the extent that Mr. Hill contends that the beeping indicated that he was under some sort of medical duress or discomfort of which the agents took advantage, the Court disagrees, as Mr. Hill has not presented any evidence as to what the beeping noise represented, much less that it indicates any significant medical concern or, indeed, anything about his state of mind at the time of the interview.  Further, no medical staff bothered to investigate the source of the beeping before it ended.

Mr. Hill also cites *Mincey v. Arizona*, 437 U.S. 385 (1987), in his initial motion for the proposition that any use of an involuntary statement against a defendant violates due process. [*See* Doc. 13 at 2.] While that proposition is undoubtedly true, *Mincey* is factually distinguishable. In *Mincey*, the Supreme Court held on facts far more egregious than here that Mincey's statements made to law enforcement during a hospital interview were involuntary, and therefore inadmissible even for impeachment purposes. 437 U.S. at 401-02. During his arrest, Mincey sustained a gunshot wound to the hip, which left him partially paralyzed in the right leg. *Id.* at 396. He was transported to the hospital emergency department, where tubes were inserted down his throat to help him breathe and through his nose to his stomach to keep him from vomiting, a catheter was inserted into his bladder, he was attached to an IV, and he received "various drugs." *Id.* He was then transferred to the ICU. *Id.* Later in the evening on the day of the incident, a detective came to the ICU to question Mincey. *Id.* The detective advised Mincey of his *Miranda* rights and proceeded to ask questions about the events earlier that day. *Id.* Unable to talk due to the tube in his mouth, Mincey responded to the detective's questions by writing answers on paper. *Id.* He also repeatedly asked that the interrogation stop until he could get a lawyer, but the detective refused and

44

continued to question him for around four hours, even though some of Mincey's

answers were entirely incoherent and he lost consciously multiple times.  *Id.*  The

Supreme Court summarized the circumstances of the interview as follows:

> It is hard to imagine a situation less conducive to the exercise of "a
> rational intellect and a free will" than Mincey's.  He had been
> seriously wounded just a few hours earlier, and had arrived at the
> hospital "depressed almost to the point of coma," according to his
> attending physician.  Although he had received some treatment, his
> condition at the time of [the detective's] interrogation was still
> sufficiently serious that he was in the intensive care unit.  He
> complained to [the detective] that the pain in his leg was
> "unbearable."  He was evidently confused and unable to think clearly
> about either the events of that afternoon or the circumstances of his
> interrogation, since some of his written answers were on their face
> not entirely coherent.  Finally, while Mincey was being questioned
> he was lying on his back on a hospital bed, encumbered by tubes,
> needles, and breathing apparatus.  He was, in short, "at the complete
> mercy" of [the detective], unable to escape or resist the thrust of [the
> detective's] interrogation.
>
> In this debilitated and helpless condition, Mincey clearly expressed
> his wish not to be interrogated.  As soon as [the detective's] questions
> turned to the details of the afternoon's events, Mincey wrote: "This
> is all I can say without a lawyer."  [The detective] nonetheless
> continued to question him, and a nurse who was present suggested it
> would be best if Mincey answered.  Mincey gave unresponsive or
> uninformative answers to several more questions, and then said again
> that he did not want to talk without a lawyer.  [The detective] ignored
> that request and another made immediately thereafter. Indeed,
> throughout the interrogation Mincey vainly asked [the detective] to
> desist.  Moreover, he complained several times that he was confused
> or unable to think clearly, or that he could answer more accurately
> the next day.  But despite Mincey's entreaties to be let alone, [the
> detective] ceased the interrogation only during intervals when

45

> Mincey lost consciousness or received medical treatment, and after each such interruption returned relentlessly to his task. The statements at issue were thus the result of virtually continuous questioning of a seriously and painfully wounded man on the edge of consciousness.

*Id.* at 398-401 (citations and footnotes omitted). Under these circumstances, the Court held that "Mincey's statements were not the product of his free and rational choice" and that "[t]o the contrary, the undisputed evidence makes clear that Mincey wanted *not* to answer [the detective]" and was "weakened by pain and shock, isolated from family, friends, and legal counsel, and barely conscious, and his will was simply overborne." *Id.* at 401-02.

There are several key differences between Mincey's and Mr. Hill's interrogations. Most notably, Mincey attempted to invoke his rights, whereas at no point did Mr. Hill do so during his interviews with SA Burke and SA Costa—to the contrary, Mr. Hill repeated on numerous occasions his desire to speak with the agents. Mincey's medical condition was also far worse than Mr. Hill's at the time of the interviews. Mincey had just arrived at the hospital that day and was slipping in and out of consciousness during the questioning. Mincey also complained that he was confused, unable to think clearly, and could respond more appropriately the following day, and yet the detective continued to question him. Mr. Hill was far

46

more stable, he generally responded appropriately and audibly to questions, and he did not tell the agents that he was confused or unable to think clearly.

In sum, considering the totality of the circumstances, the government has met its burden to show that Mr. Hill voluntarily waived his *Miranda* rights.

## 2. Whether Mr. Hill's *Miranda* Waiver Was Knowing and Intelligent

As noted above, is not enough to find that Mr. Hill voluntarily waived his rights; the Court "must also determine whether the waiver was knowing and intelligent." *Cristobal*, 293 F.3d at 142. "With regard to the second prong of *Miranda*, the test of whether a person is too affected by alcohol, drugs, or pain to knowingly, intelligently, and voluntarily waive his Miranda rights is one of coherence and an understanding of what is happening." *United States v. Harris*, No. 4:11-CR-18-HLM-WEJ, 2011 WL 5514003, at *7 (N.D. Ga. Oct. 21, 2011), *report and recommendation adopted*, 2011 WL 5514058 (N.D. Ga. Nov. 10, 2011). Put differently, "the question presented here is whether [the defendant] was coherent and had an understanding of what was happening when he waived his *Miranda* rights such that he was not too affected by pain or medicine to be fully aware of the nature of the right being abandoned." *United States v. Atkins*, No. 1:08-CR-010-MHS-RGV, 2008 WL 11431077, at *6 (N.D. Ga. May 6, 2008)

(quoting *United States v. Adamson*, No. 04-672, 2008 WL 167299, *7 (E.D. Pa. Jan. 16, 2008)) (quotation marks omitted; alteration adopted), *report and recommendation adopted*, 2008 WL 11432087 (N.D. Ga. June 19, 2008).

This is a close call—at least much closer than the issue of voluntariness—but I am persuaded that the totality of the circumstances demonstrates that Mr. Hill's waivers were knowing and intelligent. First, putting aside for a moment Mr. Hill's medical condition, his education and experiences indicate that he had sufficient understanding of his rights he was waiving. Mr. Hill has a high school education and speaks and reads English. In addition, on August 22, 2017—around four months before the interviews at issue in this case—Marietta Police Department officers arrested Mr. Hill on a narcotics-related offense. (Hr'g Tr. at 45.) The officers attempted to interview Mr. Hill, but he requested a lawyer. (*Id.*) Similarly, when SA Cleary and SA James attempted to interview Mr. Hill about the substantive drug charges for which he had already been indicted and which were the basis for his arrest on January 5, he refused to execute all of the waiver forms—evidencing an awareness that he could refuse to answer further questioning.

Next, considering Mr. Hill's medical circumstances, the evidence preponderates in favor of the government that he retained a sufficient level of

48

understanding as to the nature of the rights he was waiving.  Both times SA Burke

advised Mr. Hill of his *Miranda* rights, Mr. Hill did not ask for clarification, stop

the interview, request counsel, or indicate that he did not understand his rights.  His

statements and responses were coherent and comprehensible.   The interview

recordings indicate that Mr. Hill understood his rights.  As SA Burke read the

advice-of-rights form at the beginning of the first interview, Mr. Hill provided

repeatedly verbal confirmation that he understood what SA Burke was reading to

him.  (*See* Gov't Ex. 1-A at 7-8.)  In executing the waiver forms, Mr. Hill stated "I

want to talk to you guys," indicating his desire to forego any right to remain silent.

(*Id.* at 7.)  The next day, Mr. Hill told SA Burke that he remembered meeting with

the agents and signing the "paperwork" the day before.  (Gov't Ex. 2-A at 3.)  Mr.

Hill even went so far as to tell the agents that they did not have to advise him of his

rights a second time.  (*Id.* at 3-4.)  As he did the day before, Mr. Hill again verbally

stressed his desire to "talk to you guys" as he executed the waiver paperwork.  (*Id.*

at 7, 9.)  Importantly—and obviously—on both occasions, Mr. Hill in fact signed

the advice-of-rights form, indicating that he was waiving his rights.[18] (Gov't Exs. 4, 6.)

---

[18] Though not addressed by Mr. Hill, I note that Mr. Hill's confusion about the effect of the presentment waiver and his reasons for declining to sign it during the attempted interview with SA Cleary and SA James arguably counsels against the government. Specifically, Mr. Hill told SA Cleary and SA James that he had not seen the presentment waiver before (even though he had, in fact, and signed substantively identical copies twice during the interviews with SA Burke and SA Costa). In addition, he appeared to state that he believed that if he signed the waiver, he would be transported to a detention facility and moved out of the hospital.

There are numerous possibilities that could explain this interaction. In the course of concluding the prior interview, SA Burke mentioned that when Mr. Hill had recuperated more and was ready to be moved, he would likely be transported to the infirmary of a federal detention center. (Gov't Ex. 2-A at 61.) This comment may have concerned Mr. Hill and resulted in his apprehension about signing the presentment waiver. Alternatively, SA James gave Mr. Hill a copy of his arrest warrant on the underlying charges, and in the course of explaining the presentment waiver, repeatedly indicated that she and SA Cleary were there to interview him about the drug charges for which he had already been indicted. (Gov't Ex. 9 at 2:25-6:11.) While Mr. Hill was willing to offer information about the January 5 events for which he had not yet been charged (and about which he had clear regret), it may have dawned on him during the course of SA James's discussion of the presentment waiver (and the subject of their inquiry) that he did not want to be similarly forthcoming about this separate subject—the details of alleged drug charges. Finally, it may have been that Mr. Hill was simply confused at that point. But even if he were confused about what the presentment waiver amounted to, he was clear that he understood his right not to answer questions.

Thus, even if the explanation is confusion, viewing the totality of the circumstances and keeping in mind that the government's burden of proof is one of a preponderance of the evidence, I still find that the government has met its burden to show that Mr. Hill's waiver of his *Miranda* rights was knowing and

The manner in which Mr. Hill responded to questions also supports that he was aware of his *Miranda* rights and the consequences of waiving them. Though there were a handful of moments when Mr. Hill gave context-inappropriate responses to questions, mumbled, or did not respond audibly, the vast majority of the time he responded appropriately to questions and his diction was sufficiently clear.[19] While Mr. Hill points out that he did not answer or acknowledge some questions audibly [*see* Doc. 42 at 4]; however, it also appears that at times Mr. Hill responded nonverbally to SA Burke, which in turn prompted SA Burke to follow up with clarifying questions (*see, e.g.,* Hr'g Tr. at 76).

As for the substance of his responses, Mr. Hill is correct that, at times, his statements to the agents conflicted with what is shown on video recordings and even his own previous account of the events—in particular, the name and general

───────────────

intelligent based upon the other factors discussed above and below, which outweigh any potential confusion Mr. Hill had with SA James.

[19] Mr. Hill observes that at the beginning of the first interview, he referred to someone named "Fiona" in response to SA Burke's initial questions. (Gov't Ex. 1-A at 1.) The government suggests that Mr. Hill's reference to "Fiona" "may have been a result of the defendant mishearing [SA Burke] asking him whether he was 'feeling all right.'" [Doc. 45 at 3; *see also* Hr'g Tr. at 62 ("My belief is that when I said 'feeling all right" maybe I spoke too fast or mumbled, and that he interpreted that as Fiona.").] I agree with the government that the most plausible explanation for Mr. Hill's response is that he misunderstood SA Burke, especially since Mr. Hill's responses to questions were otherwise context-appropriate.

location of the hotel, whether SA Szabo had been shot, when SA Szabo actually shot at him, and whether his girlfriend was in the truck with him.  But, viewing the interviews as a whole, those inaccuracies and inconsistencies do not mean that he lacked the mental wherewithal to understand the nature of his rights and the consequences of waiving them.   In general, he responded appropriately and coherently to questions, his answers were logical and rational, and his recollection of his arrest also generally matched up with the video footage of the incident and SA Burke's testimony.  He recalled that he first encountered SA Szabo in the hotel lobby; his girlfriend was present at the time; he ran out to the hotel parking lot and jumped in his truck, which had been backed into a parking spot, to get away; SA Szabo followed him and clung onto the side of the truck; SA Szabo shot him; he took a left out of the hotel parking lot (which was near a McDonalds) and crossed over an interstate; he got out of the truck and lay briefly with SA Szabo on the ground as SA Szabo called 911; and he left the agent and returned to the hotel, where he blacked out.  During both interviews, he expressed remorse for his alleged actions and repeatedly stated that he did not know SA Szabo was a law enforcement agent, all of which suggests he had the mental wherewithal to make a calculated decision to help his situation by giving a mitigating explanation.  So, even though

Mr. Hill did not have total recall of the events surrounding his arrest, I am not persuaded that his difficulty remembering specific details of the incident, on balance, means that he lacked the ability to knowingly or intelligently waive his *Miranda* rights.

Perhaps the strongest evidence supporting Mr. Hill's motion is the expert opinion evidence of Dr. Liao. I credit—and appreciate—Dr. Liao's testimony about the effects that medication administered to Mr. Hill and his treatment in the hospital may have had on his cognitive abilities. But, keeping in mind the legal standards applicable here—including the Court's obligation to view the record in totality—I find that the testimony of SA Burke, the audio recordings of the interview, and the fact that most of the medications had been tapered off before the first interview outweigh Dr. Liao's opinion that Mr. Hill was so impaired cognitively at the time of the interviews that he could not knowingly or intelligently waive his rights.

According to Dr. Liao's chart summarizing the times and dosages administered to Mr. Hill from January 22 to January 26, 2018, by the time that Mr. Hill was interviewed, the dosages of most of the opiates, sedatives, and anti-psychotic medications had largely been tapered. (*See* Def. Ex. 4.) On January 25,

Mr. Hill's continuous intravenous infusion of fentanyl stopped at 12:15 am, he received 10 mg of oxycodone twice, at 2:06 a.m. and at 6:22 a.m., and he refused oxycodone at 10:55 a.m. (*See* Def. Ex. 4.) Following the termination of the first interview, January 25, 2018, Mr. Hill was administered additional dosages of fentanyl at 12:34 p.m., 1:35 p.m., 2:02 p.m., apparently in connection with his surgery that day. (*Id.*) He was not administered additional opioids after the 2:02 p.m. fentanyl dose. (*Id.*) Mr. Hill was also administered quetiapine (one of the antipsychotic medications) at 11:05 p.m. on January 24, 2018, and his next dose was given at 10:49 p.m. on January 25. (*Id.*) Dr. Liao testified that Mr. Hill, given his condition, should have been able to metabolize fentanyl in no more than six hours (a heathy person doing so in two to four hours) and that quetiapine would generally be metabolized in six or seven hours in a healthy person (and longer for Mr. Hill), but could not say how much time it actually took Mr. Hill do so. (Hr'g Tr. at 118, 129, 132.) She did not testify how long it would take to metabolize oxycontin.

By the time the first interview began, then, it had been nearly five hours since his most recent dose of oxycodone, eleven hours since his fentanyl drip had been discontinued, and around twelve hours since his most recent dose of quetiapine.

54

(Def. Ex. 4.)  Likewise, at the time of the second interview, Mr. Hill had not been administered fentanyl for nearly eighteen hours, and had not had quetiapine for nearly ten hours.  (*Id.*)  Based on the record before the Court, I am not persuaded that the sedative and other effects of Mr. Hill's medication regimen—and, more generally his hospitalization—substantially impacted his ability to appreciate his circumstances, make decisions, or understand the nature of the rights he was waiving.  Again, Mr. Hill appeared lucid during both interviews, he indicated his understanding of his *Miranda* rights, and he very clearly wanted to speak to the agents about the incident, likely in an effort to express his regret and do whatever he could to mitigate the consequences he faced.  Indeed, Mr. Hill concluded his conversation with SA Burke by asking him to apologize to SA Szabo, noting how much he had been praying about and contemplating what had happened with SA Szabo and how close they came to dying, explaining that he was "really not a bad dude at all," and finally, asking if he would be charged.  (Gov't Ex. 2-A at 55-56.) Mr. Hill was aware of the seriousness of the events on January 5, 2018, his remorse over the outcome, and the possible consequences to himself.  Viewing the totality of the circumstances, as the Court must, the recordings of the interviews indicate that despite his medications, Mr. Hill was alert, responsive, and coherent;

understood the gravity of his situation; and nevertheless wished to speak with law enforcement—all of which strongly suggests that he understood what was happening when he waived his rights.[20]

None of the cases that Mr. Hill cites are on point or counsel a different result in this case.  Mr. Hill relies on *United States v. Burnett*, No. 11-274-01, 2013 WL 3380532 (E.D. Pa. July 8, 2012), for the proposition that "[a] suspect's abilities to recall specific and detailed information does not necessarily demonstrate his ability to appreciate the consequences of revealing those details."[21]  [Doc. 42 at 18.]  That

_____

[20] Mr. Hill argues that his *Miranda* waiver should not be valid because "his 'informed consent' would not have been considered valid in the health field." [Doc. 42 at 19.]  The Court is not aware of any authority—and Mr. Hill points to none—to support the proposition that if a person cannot provide informed consent in the medical context, he or she lacks the ability to waive *Miranda*.  What's more, the evidence of record does not compel a finding that Mr. Hill could not have provided informed consent on January 25 or 26.  SA Burke acknowledged that during Mr. Hill's hospitalization, the FBI approved medical treatment, but Mr. Hill was unconscious for three weeks, so, obviously, during that time period he could not have given any consent.  (*See* Hr'g Tr. at 50-51.)  Mr. Hill was of course not interviewed then.  Likewise, Dr. Liao testified that "based on [her] experience after waking up in the ICU for three weeks, it would be very difficult to obtain a truly informed consent regarding the adverse effects and also the understanding and the reasoning for the [medical] procedures." (*Id.* at 122.)  She did not, however, opine that Mr. Hill could not have done so on January 25 or 26, 2018.

[21] Mr. Hill cited an order issued in *Burnett* dated August 1, 2012 without providing a Westlaw or Lexis citation.  An order was entered that date, *see United States v. Burnett*, No 11-274-01, 2012 WL 3113994 (E.D. Pa. Aug. 1, 2012); however, that order dealt with the invocation of the right to counsel, not whether a

case—which is not binding—is factually distinguishable, as the defendant was on a continuous morphine drip at the time he was being interrogated by law enforcement. *Burnett*, 2013 WL 3380532 at *6-7. The court in *Burnett* recognized the case as a close one, and declined to find a valid waiver precisely because Burnett was self-administering enough morphine during questioning to impair cognitive functions. *Id.* at *7; *see also id.* at *6 (noting further that questioning detective never talked to hospital staff about Burnett's status). As discussed above, Mr. Hill had been tapered off of most of the relevant medications well before he was interviewed. Mr. Hill also cites, in passing, *United States v. Harrold*, 679 F. Supp. 2d 1336 (N.D. Ga. 2009) and *United States v. Patterson*, No. 1:06-cr-500-1-TWT-JFK, No. 2007 WL 2331080 (N.D. Ga. 2007); however, in both of those cases, the court found that the defendants' *Miranda* waivers were valid.

In sum, after considering the totality of the circumstances and keeping in mind that the government bears the burden of demonstrating a knowing and intelligent waiver by a preponderance of the evidence, I find that the government has met its burden in this case, and that the evidence shows more likely than not

_____

waiver was knowing or intelligent. It appears that Mr. Hill intended to refer to an order issued in July 8, 2013, which I address.

that Mr. Hill's *Miranda* waivers on January 25 and 26, 2018 were knowing and intelligent.

### 3.   Voluntariness of Statements

I finally address the voluntariness of the statements following the *Miranda* waivers.  As noted above, voluntariness of statements is analyzed similarly to voluntariness of the *Miranda* waiver.  *See Byrd*, 2017 WL 3821696, at *5; *United States v. Robinson*, No. 1:14-CR-0176-RWS-JSA, 2014 WL 6667018, at *6 (N.D. Ga. Nov. 24, 2014), *report and recommendation adopted*, *id.* at *1.  In that vein, "the absence of official coercion is a *sine qua non* of effective consent."  *Byrd*, 2017 WL 3821696, at *5.  The Eleventh Circuit has stated:

> Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession.  Isolated incidents of police deception, and discussions of realistic penalties for cooperative and non-cooperative defendants, are normally insufficient to preclude free choice.

*Robinson*, 2014 WL 6667018, at *6 (quoting *United States v. Jones*, 32 F.3d 1512, 1517 (11th Cir. 1994)).

For the same reasons as discussed in Part II.C.1. above, I find that Mr. Hill's statements during both interviews with SA Burke and SA Costa were voluntarily made.  The first interview lasted for approximately thirty minutes, and the second,

for about an hour.  (*See* Gov't Exs. 1, 2.)  The agents did not use or threaten physical force, make any promises to induce a confession, or condition medical treatment on his cooperation.  Nor did the agents take advantage of Mr. Hill's medical condition.  They waited a day after Mr. Hill regained consciousness to attempt the first interview, they checked with medical staff before beginning the first interview, they collected and preserved information about Mr. Hill's medications (*see* Hr'g Tr. at 85), they did not prevent him from receiving medical attention.  The tone of both interviews was nonconfrontational; neither agent yelled at Mr. Hill or used obscenities.  The totality of the circumstances establishes that Mr. Hill's post-*Miranda* statements in both interviews were voluntary.

## III.   CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Mr. Hill's motion to suppress [Doc. 13] be **DENIED**.

I have now addressed all referred pretrial matters relating to this defendant and have not been advised of any impediments to the scheduling of a trial. Accordingly, this case is **CERTIFIED READY FOR TRIAL.**

IT IS SO RECOMMENDED this 6th day of December, 2019.

_____
JOHN K. LARKINS III
United States Magistrate Judge

59