IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL ACTION FILE NO. |
| v. | |
| | 1:18-CR-277-AT-JKL |
| CEDRICK HILL, | |
| Defendant. | |

## FINAL REPORT AND RECOMMENDATION

This case is before the Court on Defendant Cedrick Hill's "Motion to Suppress Evidence Seized From Warrantless Search and Seizure of Mr. Hill's Vehicle." [Doc. 128.] In his motion, Mr. Hill seeks to suppress three cell phones—an Apple iPhone seized from his person and two "flip phones" seized from a Dodge Durango he was driving—obtained by the government following a coordinated pretextual traffic stop conducted by the Marietta Police Department ("MPD") on the evening of August 22, 2017. Mr. Hill argues that the phones' seizure violated the Fourth Amendment because the traffic stop was pretextual and conducted in an "extraordinary manner." In the alternative, he argues that even if the stop were constitutional, the government cannot establish a constitutional basis for the warrantless seizure of the two flip phones from his car. [Doc. 144.]

On December 6, 2021, I held an evidentiary hearing.  [Doc. 141 ("Hr'g Tr.").[1]]  Three MPD officers involved in the stop—Sgt. Paul Anthony Reynolds, Sgt. Rinaldo Figueroa, and DEA Special Agent Jordan Mileshko—testified at the hearing.[2]  Following the hearing, Mr. Hill filed a post-hearing brief [Doc. 144], the government a response [Doc. 146], and Mr. Hill a reply [Doc. 151].  On March 11, 2022, I held oral argument on the motion.  [Doc. 152.]  For the reasons that follow, it is **RECOMMENDED** that Mr. Hill's motion be **DENIED**.

## I.    BACKGROUND

In 2015 or 2016, Officer Reynolds opened an investigation into "Dem Marietta Boyz," a local Marietta gang.  (Hr'g Tr. at 5-6, 7-8.)  Through the investigation, he became familiar with Mr. Hill, who allegedly had ties to the gang. (*Id.* at 8.)  At some point in August 2017, Officer Reynolds learned that in October

---

[1] The Court admitted four government exhibits.  Exhibits 1 to 3 appear on the docket at Docket Entries 138-1, 138-2, and 138-3.  Exhibit 4 is a DVD containing two sequential video files, named 2017-08-22-23-27-44.MOV and 2017-08-22-23-27-45.MOV.  I refer to these videos as "Video 1" and "Video 2," respectively, and cite specific portions using the timestamp in lower right corner the video.

[2] At the time of the traffic stop, Sgt. Reynolds was employed as a gang task force officer with the MPD and a task force officer with the FBI (Hr'g Tr. at 6, 23); Sgt. Mileshko and SA Figueroa were employed as officers in the MPD's crime interdiction unit (*id*. at 33, 63).  For the sake of simplicity, I refer to them as "Officers" within this report and recommendation.

2

of that year, a warrant would be issued for Mr. Hill's arrest in connection with a federal investigation. (*Id.* at 8.) Expecting that he would take the lead in apprehending Mr. Hill, Officer Reynolds decided to make contact with Mr. Hill to determine the address at which he could be located and arrested. (*Id.* at 8, 24, 36.)

On the evening of August 22, 2017, Officer Reynolds learned that Officer Mileshko and fellow MPD officer Daniel Van Ness,[3] who were working undercover in separate unmarked vehicles, had spotted a white Dodge Durango that matched description of a vehicle Mr. Hill had been seen driving earlier that day. (Hr'g Tr. at 8-9, 24.) Officer Reynolds instructed them to notify him if they obtained probable cause to stop the Durango so that an officer in a marked patrol car could perform a stop. (*Id.* at 9-10, 22.) Officer Mileshko and Officer Van Ness complied, following Mr. Hill as he drove. (*Id.* at 39-40.) Initially, Officer Van Ness was directly behind Hill, with Officer Mileshko behind Officer Van Ness; however, after a short time, Officer Van Ness turned, leaving Officer Mileshko in the primary position behind Mr. Hill. (*Id.* at 40, 42.) While following Mr. Hill, Officer Mileshko observed Mr. Hill commit several moving violations, including

---

[3] At the time, Officer Van Ness also worked as an agent in the MPD's crime interdiction unit. (Hr'g Tr. at 39.)

3

stopping beyond the balk line several times (*id.* at 42, 46, 47-48) and crossing over the double yellow line as he took a right turn onto another street (*id.* at 45).  Having witnessed these traffic violations, Officer Mileshko or Officer Van Ness[4] radioed Officer Figueroa, who was about a block away in a marked patrol car.  (*Id.* at 11, 66-67, 75.)   Officer Figueroa then approached behind Officer Mileshko and activated his lights.  (Video 2 at 23:31:11.)  Officer Mileshko moved into the opposing lane of travel, placing Officer Figueroa immediately behind Mr. Hill.  (*Id.* at 11:31:15.)  Mr. Hill stopped almost immediately once Officer Figueroa was behind him with his lights on.  (*Id.*)  Meanwhile, Officer Mileshko passed Mr. Hill on the left and pulled to a stop in front of Mr. Hill's vehicle, boxing Mr. Hill in so he could not flee.  (*Id.* at 11:31:18; Hr'g Tr. 50.)

Officer Figueroa exited his patrol car and approached first, immediately smelling what he believed to be burnt marijuana coming from the Durango.  (Hr'g Tr. at 11, 68.)  Anticipating that he would search the vehicle, Officer Figueroa radioed Officer Reynolds for backup.  (*Id.* at 11, 76.) Officer Reynolds was located about 500 yards away and arrived at the scene within a minute.  (*Id.* at 11, 25.)

---

[4] It is unclear which officer radioed Officer Figueroa, but that ambiguity does not impact the analysis of Mr. Hill's suppression arguments.

4

Officer Reynolds approached Mr. Hill, who was still seated in the Durango, and asked him to step out of the car. (*Id.* at 12.) Officer Reynolds escorted Mr. Hill to the front of Officer Figueroa's patrol car, conducted a brief pat-down for weapons, and began speaking with Mr. Hill. (*Id.*) Officer Reynolds asked Mr. Hill where he lived and for his home address. (*Id.* at 30-31.)

While Officer Reynolds was talking with Mr. Hill, Officer Figueroa searched the Durango. (Hr'g Tr. at 12.) Officer Figueroa found two bottles of what he suspected was promethazine, a schedule V controlled substance. (*Id.* at 12, 28.) He showed them to Officer Reynolds, who then placed Mr. Hill under arrest for failure to maintain lane and intent to distribute promethazine. (*Id.* at 12, 14.) Officer Reynolds handcuffed and searched Mr. Hill's person. (*Id.* at 12.) During the search, Officer Reynolds located an Apple iPhone on Mr. Hill. (*Id.*)

In the MPD, it is standard operating procedure to inventory and impound a vehicle when its driver is arrested. (Hr'g Tr. at 17, 69; Gov't Ex. 2 at 7.) When Mr. Hill was arrested, then, an inventory of the vehicle was conducted. (Hr'g Tr. at 13-14.) Two flip phones were seized from the Durango. (*Id.* at 13, 26.[5]) Officer

---

[5] Officer Reynolds initially testified that he took the phones from the vehicle (Hr'g Tr. at 13), but on cross examination stated that he did remove those phones and that Officer Figueroa likely did (*id.* at 26). Officer Figueroa, however, testified

Reynolds described those phones as "burner phones" because they were prepaid, inexpensive devices that, in his experience, drug dealers use to communicate with persons who use or sell drugs. (*Id.*) Officer Reynolds later obtained a search warrant to search the three phones seized from Mr. Hill and the Durango. (Hr'g Tr. at 14.)

Following his arrest, Mr. Hill was transported to the MPD headquarters to be interviewed. (Hr'g Tr. at 27.) Officer Reynolds read Mr. Hill his *Miranda* rights, and Mr. Hill invoked his right to an attorney. (*Id.*) Mr. Hill was not questioned further. (*Id.*)

## II. ANALYSIS

### A. Though Pretextual, the Traffic Stop Was Constitutional

In his primary argument for suppression—and the only argument for suppressing the iPhone seized from his person—Mr. Hill contends that the pretextual nature of the traffic stop ought to render the stop and seizure unconstitutional. [Doc. 144 at 5-9.] But, as Mr. Hill acknowledges, the Supreme Court's decision in *Whren v. United States*, 517 U.S. 806 (1996), forecloses this

---

that that he only removed the bottles of suspected promethazine from the Durango and did not recall finding two cell phones. (*Id.* at 69-70.) This apparent gap in this testimony will be discussed in greater detail in the discussion that follows.

argument.  In *Whren*, the Court held that a traffic stop is constitutional if it is based upon probable cause that a traffic violation occurred, even if law enforcement's real motivation is suspicion of other criminal activity.  *Whren*, 517 U.S. at 810.  As a result, the subjective reasons that any of the officers had to stop a suspect are irrelevant, "so long as they had probable cause to support the articulated traffic violations."  *United States v. Wilson*, 979 F.3d 889, 909 (11th Cir. 2020).

At the suppresson hearing, Officer Mileshko testified that he observed Mr. Hill cross over the center double-yellow lines and repeatedly fail to stop at balk lines, which are traffic violations under Georgia law.  *See* O.C.G.A. §§ 40-6-48(1) (requiring vehicles to be driven within a single lane); 40-6-72(b) (providing that drivers approaching a stop sign must stop at a clearly marked stop line if there is one).  Mr. Hill does not present any evidence to controvert this testimony; indeed, the video footage admitted into evidence corroborates it.  (*See*, *e.g.*, Video 2 at 23:30:26, 23:30:41, 23:31:05.)  And because probable cause existed, it is immaterial that the traffic stop was a pretext for MPD officers to speak with Mr. Hill in order find out where he lived so that they could arrest him two months later on anticipated federal charges.

Mr. Hill argues that "it is time for [*Whren*] to be overruled," and urges the Court to adopt "a rule that prohibits pretextual traffic stops." [Doc. 144 at 8; *see also* Doc. 151 at 2-5.] The problem for this argument is that the Supreme Court has settled this issue, *see United States v. Holloman*, 113 F.3d 192, 194 (11th Cir. 1997) (explaining that *Whren* "squarely rejected the pretextual stop analysis" and that an officer's "ulterior motives" for a stop are not relevant so long as it is justified by probable cause), and, as a result, this Court is not empowered to accept Mr. Hill's invitation, no matter how well-argued, to disregard *Whren* and apply a rule that would directly contradict binding Supreme Court precedent.

Mr. Hill alternatively argues that even if the Court applies *Whren* (which, of course, the Court is bound to do), the Court should suppress the seizure of the phones because the traffic stop was still conducted in an "extraordinary manner" and, thus, violated the Fourth Amendment's protection against unreasonable searches and seizures. [Doc. 144 at 9-11.] Specifically, Mr. Hill points out that the traffic stop occurred late in the evening; it involved four law enforcement officers in four separate vehicles; Officer Figueroa had a canine present in his patrol car; the officers blocked Mr. Hill's path forward, and "pinned him in" so he was

unable to drive away; and Officer Reynolds questioned him "unlawfully" prior to his arrest.  [*Id.* at 10.]

In *Whren*, the defendant argued that courts should apply a balancing test to evaluate the reasonableness of pretextual traffic stops in all instances, weighing "the governmental and individual interests implicated in a traffic stop."  *Whren*, 517 U.S. at 816.  The Supreme Court rejected that argument, explaining that except for "searches or seizures conducted in an extraordinary manner, unusually harmful to an individual's privacy or even physical interests," "probable cause to believe the law has been broken 'outbalances' private interest in avoiding police contact." *Id.* at 818.  The Court went on to identify only four types of cases involving "extreme" measures that trigger a balancing analysis to determine the reasonableness and constitutionality of a search:  seizure by means of deadly force, unannounced entry into a home, entry into a home without a warrant, and physical penetration of the body.  *Id.* (citations omitted).

*Whren* makes clear that the "extraordinary manner" exception is reserved for "extreme practice[s]."  517 U.S. at 818.  On the record before the Court, the undersigned cannot find that Mr. Hill's traffic stop was conducted in an extraordinary manner.  Mr. Hill cites no case to support his contention that his

traffic stop was on par with the examples the Supreme Court identified, and given the Supreme Court's recognition that it is the truly rare case—akin to invading the home or using lethal force—that can meet this high standard, Mr. Hill's lack of authority weighs against him.  Likewise, his contention that a single officer is normally able to handle a routine traffic stop (even if true) does not mean that the involvement of multiple officers constituted extreme circumstances similar to the cases cited by *Whren*.   Here, the officers testified that stops involving a combination of unmarked, undercover vehicles and uniformed officers in marked patrol cars were "common," and Mr. Hill has not offered presented evidence or testimony to dispute that.  (Hr'g Tr. at 67-68; *see also id.* at 60.)  Moreover, Mr. Hill's assertion that there were four officers present on scene does not appear to be entirely accurate.  While four officers were directly involved in events leading up to the stop, it appears that only two, Officer Figueroa and Officer Mileshko, were present at the inception of the stop, and it was only after Officer Figueroa smelled the odor of burnt marijuana and decided to search the Durango that he contacted Officer Reynolds for backup.[6]  But significantly, there was nothing about the officers' interaction with Mr. Hill that was extreme or extraordinary.  The officers

---

[6] It is unclear when Officer Van Ness appeared at the scene.

did not use lethal force, much less draw a weapon or threaten physical force against Mr. Hill.

The other circumstances of Mr. Hill's encounter do not support a finding that the police used extraordinary measures.  The fact that Mr. Hill's car was blocked in so he could not flee in the Durango does not make the encounter extreme.  *See United States v. Obasuyi*, No. 13-20777-CR, 2014 WL 495738, at *5 (S.D. Fla. Feb. 6, 2014) (finding that traffic stop did not involve "the level of extraordinariness as contemplated by *Whren*" where police intentionally surrounded defendant's car to prevent flight for safety), *report and recommendation adopted*, *id.* at *1.  The fact that the encounter occurred at night (around 11:30 p.m.) also does not help Mr. Hill—if anything, the risk to the officers' safety was greater in darkness than in the daytime, so, arguably, the presence of multiple officers was all the more reasonable given the time of day.  As for the presence of the canine in Officer Figueroa's vehicle, this too does not show extraordinary police measures because the canine was not deployed and there is no evidence Mr. Hill was even aware of its presence at the time.  (*See* Hr'g Tr. at 72.) Finally, Mr. Hill's pre-arrest statements to Officer Reynolds, during which he confirmed his address, does not make the encounter extraordinary because there

11

was nothing "unlawful" about Officer's Reynolds asking Mr. Hill for his address before he was under arrest.  *See Berkemer v. McCarty*, 468 U.S. 420, 436-37 (1984) (holding that questioning during traffic stop does not automatically constitute custodial interrogation even though a driver who is pulled over by police would not feel free to leave the scene).  Indeed, Mr. Hill does not move to suppress this statement.[7]  For all these reasons, then, the measures that the police used during the encounter with Mr. Hill on August 22 are a far cry from the sort of extreme police tactics identified in *Whren* that would require further analysis balancing the interests of Mr. Hill and the government.

Based upon the forgoing analysis, the stop on August 22 was not unconstitutional, and Mr. Hill's request to suppress the iPhone should be **DENIED**.

---

[7] In his reply, Mr. Hill argues that "[t]he whole premise and reason behind this use of police resources and traffic stop was to establish probable cause to detain or arrest Hill so that Officer Reynolds could then 'lawfully' question him about his residency and gain information for a future arrest."  [Doc. 151 at 5.]  Mr. Hill is right—the officers readily admitted that the stop was pretextual.  (*See* Hr'g Tr. at 26, 53-54.)  But for the reasons already explained, the officer's motivations are irrelevant to the present issue of suppression.  What matters at this point in the analysis is simply whether the stop itself was conducted in an extraordinary manner, and it was not.  *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("As our citations in *Whren* make clear, the question whether a search or seizure is 'extraordinary' turns, above all else, on the manner in which the search or seizure is executed.").

12

**B.      The Seizure of the Two Cell Phones From the Durango Did Not Violate the Fourth Amendment**

Mr. Hill next challenges the warrantless seizure of the two flip phones.  He contends that the government has not met its burden to show that those devices were seized pursuant to a recognized exception to the Fourth Amendment's warrant requirement.  [Doc. 14 at 11-12.]  In particular, he points out that the government has not established who seized the phones, when precisely they were seized, or where in the vehicle they were found.  [*Id.* at 11.]

The government responds that the search of the vehicle was reasonable under the automobile exception because Officer Figueroa smelled burnt marijuana after Mr. Hill had already committed several minor moving violations, all of which gave him probable cause to believe that the car contained contraband and allowed him the legally search the vehicle.  [Doc. 146 at 14.]  Additionally, the government argues that when Officer Figueroa found the two bottles of promethazine and the two "burner phones," he was permitted to seize them as indicia of drug dealing.  [*Id.* at 12-14.]  The government, however, does not respond to Mr. Hill's more fact-specific argument that it is unclear who seized the phones, when they were seized, or where in the vehicle they were found.

13

Under the automobile exception to the warrant requirement, the police may conduct a warrantless search of a vehicle if (1) it is readily mobile and (2) probable cause exists for the search. *United States v. Dixon*, 901 F.3d 1322, 1339 (11th Cir. 2018), *cert. denied sub nom. Portela v. United States*, 139 S. Ct. 854 (2019), *and cert. denied sub nom. Chacon v. United States*, 139 S. Ct. 1392 (2019). A vehicle is "readily mobile" if it is operational. *Id.* Probable cause exists for a search where, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the vehicle. *Id.*

Here, there is no dispute that the Durango was operational and, therefore, readily mobile, as Mr. Hill was observed driving it on public streets. Likewise, probable cause existed to believe that the vehicle contained contraband or evidence of a crime because Officer Figueroa smelled the odor of burnt marijuana when he encountered Mr. Hill in the vehicle. *United States v. Reed*, No. 21-10257, 2021 WL 5629980, at *2 (11th Cir. Dec. 1, 2021) (unpublished) ("When an officer detects the odor of marijuana emanating from a vehicle, probable cause exists to support a warrantless search of the vehicle."); *Merricks v. Adkinson*, 785 F.3d 553, 560 n.3 (11th Cir. 2015) ("[T]he smell of burnt marijuana emanating from a vehicle is sufficient probable cause to search a vehicle.") (citing *United States v. Tobin*,

14

923 F.2d 1506, 1512 (11th Cir. 1991) (en banc)).  Therefore, the warrantless search

of the vehicle did not violate the Fourth Amendment.

   The next question, then, is whether the warrantless seizure of the flip phones

falls within an exception to the warrant requirement.  Mr. Hill argues that there is

a gap in the record as to precisely who seized the flip phones, where in the vehicle

they were located, or when during the course of the encounter they were found.  As

a result, Mr. Hill contends, the government has not carried its burden of establishing

an exception to the warrant requirement.  According to Mr. Hill, if the government

does not establish these particulars of the search and seizure, it cannot demonstrate

that an exception applies to authorize the seizure of the two phones.  As noted, the

government inexplicably ignores this argument.

   To recap the applicable record evidence:  Officer Figueroa found bottles of

suspected promethazine in the Durango, Officer Reynolds then placed Mr. Hill

under arrest, and during the search of Mr. Hill's person incident to arrest, Officer

Reynolds discovered the iPhone.  (Hr'g Tr. at 12-13.)  At the suppression hearing,

Officer Reynolds was asked, after he seized the iPhone, "was anything else located

in the vehicle," to which he responded, "Yes there was two . . . burner phones *I*

*located in the vehicle*."  (*Id.* at 13 (emphasis added).)  He also testified that after

he placed Mr. Hill under arrest, he put Mr. Hill "in the back seat of a patrol vehicle, ***and then an inventory of the vehicle was conducted.***"   (*Id.* at 13-14 (emphasis added).)   This testimony suggests that Officer Reynolds conducted a post-arrest inventory search of the Durango, and during that search, he found the phones.

But on cross examination, Officer Reynolds testified differently.  In response to being asked if he only seized the iPhone from Mr. Hill's person, Officer Reynolds stated, "No.  I seized the phone from his person, the promethazine, and the two other cell phones."   (Hr'g Tr. at 26.)   He was then asked, "If I'm understanding correctly, you did not play a role in actually removing those items from the car; did I get that right?"  (*Id.*)  He responded, "That is correct.  I did not." (*Id.*)  The examination continued:

> Q:  The person that would have taken any other items beyond the one that you took from Mr. Hill's person would have been Officer Figueroa or some other officer?
>
> A:  It more than likely would be Officer Figueroa.

(*Id.*)  Thus, contrary to Officer Reynolds's testimony on direct that he located the flip phones in the Durango after placing Mr. Hill under arrest, on cross, he stated that he did not seize any items from the vehicle, but that it was likely Officer Figueroa.

Unfortunately, Officer Figueroa's testimony does not clear matters up either. On direct examination, he testified that after Mr. Hill was removed from the Durango, he searched the vehicle and found the two bottles of promethazine in the center console. (Hr'g Tr. at 69.) Unsure of what he had found, he took the bottles to Officer Reynolds, who identified them as promethazine, at which time, Mr. Hill was placed under arrest. (*Id.*) Officer Figueroa testified that he returned to the Durango and conducted an inventory search because the vehicle would have to be towed and impounded. (*Id.* at 69-70.) Officer Figueroa was asked if he found anything else in the vehicle, and he responded, "No." (*Id.* at 70.) He was then asked if, at any time, he recalled finding two cell phones in the vehicle, and he responded "I don't recall if I did or didn't." (*Id.*) On cross examination, he similarly testified that the only thing he seized from the Durango was the promethazine. (*Id.* at 77-78.) But he also stated on cross examination that he had no independent recollection of what took place at the traffic stop four-and-a-half years earlier and that he had to rely on a report to refresh his recollection. (*Id.* 75-76.)

Despite the lack of clarity in the testimony, the undersigned believes that the most likely explanation for what happened is that Officer Figueroa located the flip

phones during the post-arrest inventory search of the Durango (that is, after Mr. Hill's arrest, but before the car was towed and impounded), and provided them to Officer Reynolds, believing them to be indica of drug distribution.[8]  For starters, there is no dispute that the flip phones were Mr. Hill's or that they were seized during August 22, 2017 the traffic stop.  After all, Mr. Hill concedes in his motion that the phones were "taken from him during [the] traffic stop."[9]  [Doc. 144 at 1.] In addition, as discussed above, the record, for as muddy as it may be, shows that the only items removed from the Durango before Mr. Hill was placed under arrest were the two bottles of promethazine (which provided probable cause for his arrest).[10]  As a result, the phones must have been recovered after Mr. Hill's arrest.

---

[8] Neither Officer Reynolds nor Officer Figueroa testified that the flip phones were seized along with the two bottles of promethazine; thus, the record does not support a finding that Officer Figueroa seized the phones as indicia of drug dealing during the initial, pre-arrest search of the vehicle.

[9] Indeed, Mr. Hill must show some reasonable expectation of privacy with respect to the devices in order to argue that their seizure violated his Fourth Amendment rights.  *See United States v. King*, 509 F.3d 1338, 1341 (11th Cir. 2007) (citing *United States v. Cooper*, 203 F.3d 1279, 1283-84 (11th Cir. 2000)).

[10] Mr. Hill argues that he "could equally assert that the two cell phones were seized by Officer Reynolds or Officer Figueroa during a pat-down of Hill that occurred immediately after he was removed from the vehicle, prior to Officer Figueroa finding the promethazine, which would be unlawful."  [Doc. 151 at 8.] This scenario is extremely unlikely, however, as the evidence is unequivocal that Officer Reynolds did not seize anything from Mr. Hill's person when he conducted the initial, pre-arrest pat-down of Mr. Hill.  (*See* Hr'g Tr. at 12-13.)  In contrast,

18

True, Officer Figueroa only remembered finding the promethazine and did not recall finding the flip phones in the Durango; however, the traffic stop occurred over four years prior to the suppression hearing, and he admitted that he had no independent recollection of the stop. Thus, it is reasonable to conclude that he simply did not recall finding the phones, not that he was prevaricating in his testimony. Finally, the inventory of the Durango supports these findings. The flip phones are not listed on the inventory, and the testimony of the officers was that items that are seized as evidence are not listed on an inventory. In other words, if the phones were discovered during the inventory search, but not listed on the impound inventory, the most likely reason is that they were seized as evidence during the search of the vehicle before it was impounded.

While the government would have been better-served to address Mr. Hill's argument about the gap in the evidence head-on, the undersigned finds that the government has met its burden to show that the phones were properly seized. As noted, the automobile exception authorized the warrantless search of the vehicle,

---

while Officer Reynolds' testimony concerning who recovered the flip phones is inconsistent, he does not equivocate from his recollection that the phones were recovered from the Durango. Further, if Mr. Hill really believed that the phones were seized from him during an initial pat down, he would have presented evidence and argument to support such a theory, which he has not.

and that search resulted in Officer Figueroa finding the two bottles of promethazine. This led to Mr. Hill's arrest.  Then, the Durango was searched and the two flip phones were recovered.  That search was constitutional under the automobile exception because at that point probable cause existed to believe that the vehicle contained evidence of marijuana use and probable cause had developed to believe that it contained evidence of drug distribution after the promethazine was found. While Mr. Hill contends that the phones "are not readily identified as instrumentalities of the crime of marijuana possession (the suspected crime that authorized the search to begin with) or possession with intent to distribute promethazine (the charge for which Hill was ultimately arrested for), "the law in this Circuit recognizes that cell phones are "a known tool of the drug trade." *United States v. Lisbon*, 835 F. Supp. 2d 1329, 1363 (N.D. Ga. 2011) (quoting *United States v. Nixon*, 918 F.2d 895, 900 (11th Cir. 1990)), *aff'd sub nom. United States v. Moreno*, 559 F. App'x 940 (11th Cir. 2014).  And since evidence preponderates that the flip phones were found ***after*** the discovery of the promethazine, they were properly seized under the automobile exception.  Accordingly, Mr. Hill's motion to suppress the search the flip phones should be **DENIED**.

20

## III.   CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Mr. Hill's motion to suppress [Doc. 128] be **DENIED**.

I have now addressed all referred pretrial matters relating to Mr. Hill and have not been advised of any impediments to the scheduling of a trial.  Accordingly, this case is **CERTIFIED READY FOR TRIAL.**

IT IS SO RECOMMENDED this 29th day of March, 2022.

_____
JOHN K. LARKINS III
United States Magistrate Judge